(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FISHER *v.* UNIVERSITY OF TEXAS AT AUSTIN ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 11–345.   Argued October 10, 2012—Decided June 24, 2013

The University of Texas at Austin considers race as one of various factors in its undergraduate admissions process.  The University, which is committed to increasing racial minority enrollment, adopted its current program after this Court decided *Grutter* v. *Bollinger*, 539 U. S. 306, upholding the use of race as one of many "plus factors" in an admissions program that considered the overall individual contribution of each candidate, and decided *Gratz* v. *Bollinger*, 539 U. S. 244, holding unconstitutional an admissions program that automatically awarded points to applicants from certain racial minorities.

Petitioner, who is Caucasian, was rejected for admission to the University's 2008 entering class.  She sued the University and school officials, alleging that the University's consideration of race in admissions violated the Equal Protection Clause.  The District Court granted summary judgment to the University.  Affirming, the Fifth Circuit held that *Grutter* required courts to give substantial deference to the University, both in the definition of the compelling interest in diversity's benefits and in deciding whether its specific plan was narrowly tailored to achieve its stated goal.  Applying that standard, the court upheld the University's admissions plan.

*Held*: Because the Fifth Circuit did not hold the University to the demanding burden of strict scrutiny articulated in *Grutter* and *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, its decision affirming the District Court's grant of summary judgment to the University was incorrect.  Pp. 5–13.

(a) *Bakke*, *Gratz*, and *Grutter,* which directly address the question considered here, are taken as given for purposes of deciding this case. In *Bakke*'s principal opinion, Justice Powell recognized that state university "decisions based on race or ethnic origin . . . are reviewable

under the Fourteenth Amendment," 438 U. S., at 287, using a strict scrutiny standard, *id.*, at 299. He identified as a compelling interest that could justify the consideration of race the interest in the educational benefits that flow from a diverse student body, but noted that this interest is complex, encompassing a broad array "of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Id.,* at 315

In *Gratz* and *Grutter,* the Court endorsed these precepts, observing that an admissions process with such an interest is subject to judicial review and must withstand strict scrutiny, *Gratz*, *supra*, at 275, *i.e.,* a university must clearly demonstrate that its "'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is "necessary . . . to the accomplishment" of its purpose,'" *Bakke*, *supra,* at 305. Additional guidance may be found in the Court's broader equal protection jurisprudence. See, *e.g., Rice* v. *Cayetano*, 528 U. S. 495, 517; *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 505. Strict scrutiny is a searching examination, and the government bears the burden to prove " 'that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate.' " *Ibid.* Pp. 5–8.

(b) Under *Grutter,* strict scrutiny must be applied to any admissions program using racial categories or classifications. A court may give some deference to a university's "judgment that such diversity is essential to its educational mission," 539 U. S., at 328, provided that diversity is not defined as mere racial balancing and there is a reasoned, principled explanation for the academic decision. On this point, the courts below were correct in finding that *Grutter* calls for deference to the University's experience and expertise about its educational mission. However, once the University has established that its goal of diversity is consistent with strict scrutiny, the University must prove that the means it chose to attain that diversity are narrowly tailored to its goal. On this point, the University receives no deference. *Id.,* at 333. It is at all times the University's obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id.,* at 337. Narrow tailoring also requires a reviewing court to verify that it is "necessary" for the university to use race to achieve the educational benefits of diversity. *Bakke*, *supra,* at 305. The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity.

Rather than perform this searching examination, the Fifth Circuit held petitioner could challenge only whether the University's decision

Syllabus

to use race as an admissions factor "was made in good faith." It presumed that the school had acted in good faith and gave petitioner the burden of rebutting that presumption. It thus undertook the narrow-tailoring requirement with a "degree of deference" to the school. These expressions of the controlling standard are at odds with *Grutter*'s command that "all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'" 539 U. S., at 326. Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without closely examining how the process works in practice, yet that is what the District Court and Fifth Circuit did here. The Court vacates the Fifth Circuit's judgment. But fairness to the litigants and the courts that heard the case requires that it be remanded so that the admissions process can be considered and judged under a correct analysis. In determining whether summary judgment in the University's favor was appropriate, the Fifth Circuit must assess whether the University has offered sufficient evidence to prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity. Pp. 8–13.

631 F. 3d 213, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, BREYER, ALITO, and SOTOMAYOR, JJ., joined. SCALIA, J., and THOMAS, J., filed concurring opinions. GINSBURG, J., filed a dissenting opinion. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–345

_____

## ABIGAIL NOEL FISHER, PETITIONER *v.* UNIVERSITY OF TEXAS AT AUSTIN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE KENNEDY delivered the opinion of the Court.

The University of Texas at Austin considers race as one of various factors in its undergraduate admissions process. Race is not itself assigned a numerical value for each applicant, but the University has committed itself to increasing racial minority enrollment on campus. It refers to this goal as a "critical mass." Petitioner, who is Caucasian, sued the University after her application was rejected. She contends that the University's use of race in the admissions process violated the Equal Protection Clause of the Fourteenth Amendment.

The parties asked the Court to review whether the judgment below was consistent with "this Court's decisions interpreting the Equal Protection Clause of the Fourteenth Amendment, including *Grutter* v. *Bollinger*, 539 U. S. 306 (2003)." Pet. for Cert. i. The Court concludes that the Court of Appeals did not hold the University to the demanding burden of strict scrutiny articulated in *Grutter* and *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 305 (1978) (opinion of Powell, J.). Because the Court of Appeals did not apply the correct standard of strict

scrutiny, its decision affirming the District Court's grant of summary judgment to the University was incorrect. That decision is vacated, and the case is remanded for further proceedings.

## I

### A

Located in Austin, Texas, on the most renowned campus of the Texas state university system, the University is one of the leading institutions of higher education in the Nation. Admission is prized and competitive. In 2008, when petitioner sought admission to the University's entering class, she was 1 of 29,501 applicants. From this group 12,843 were admitted, and 6,715 accepted and enrolled. Petitioner was denied admission.

In recent years the University has used three different programs to evaluate candidates for admission. The first is the program it used for some years before 1997, when the University considered two factors: a numerical score reflecting an applicant's test scores and academic performance in high school (Academic Index or AI), and the applicant's race. In 1996, this system was held unconstitutional by the United States Court of Appeals for the Fifth Circuit. It ruled the University's consideration of race violated the Equal Protection Clause because it did not further any compelling government interest. *Hopwood* v. *Texas*, 78 F. 3d 932, 955 (1996).

The second program was adopted to comply with the *Hopwood* decision. The University stopped considering race in admissions and substituted instead a new holistic metric of a candidate's potential contribution to the University, to be used in conjunction with the Academic Index. This "Personal Achievement Index" (PAI) measures a student's leadership and work experience, awards, extracurricular activities, community service, and other special circumstances that give insight into a student's back-

ground. These included growing up in a single-parent home, speaking a language other than English at home, significant family responsibilities assumed by the applicant, and the general socioeconomic condition of the student's family. Seeking to address the decline in minority enrollment after *Hopwood*, the University also expanded its outreach programs.

The Texas State Legislature also responded to the *Hopwood* decision. It enacted a measure known as the Top Ten Percent Law, codified at Tex. Educ. Code Ann. §51.803 (West 2009). Also referred to as H. B. 588, the Top Ten Percent Law grants automatic admission to any public state college, including the University, to all students in the top 10% of their class at high schools in Texas that comply with certain standards.

The University's revised admissions process, coupled with the operation of the Top Ten Percent Law, resulted in a more racially diverse environment at the University. Before the admissions program at issue in this case, in the last year under the post-*Hopwood* AI/PAI system that did not consider race, the entering class was 4.5% African-American and 16.9% Hispanic. This is in contrast with the 1996 pre-*Hopwood* and Top Ten Percent regime, when race was explicitly considered, and the University's entering freshman class was 4.1% African-American and 14.5% Hispanic.

Following this Court's decisions in *Grutter* v. *Bollinger*, *supra*, and *Gratz* v. *Bollinger*, 539 U. S. 244 (2003), the University adopted a third admissions program, the 2004 program in which the University reverted to explicit consideration of race. This is the program here at issue. In *Grutter*, the Court upheld the use of race as one of many "plus factors" in an admissions program that considered the overall individual contribution of each candidate. In *Gratz*, by contrast, the Court held unconstitutional Michigan's undergraduate admissions program, which automat-

ically awarded points to applicants from certain racial minorities.

The University's plan to resume race-conscious admissions was given formal expression in June 2004 in an internal document entitled Proposal to Consider Race and Ethnicity in Admissions (Proposal). Supp. App. 1a. The Proposal relied in substantial part on a study of a subset of undergraduate classes containing between 5 and 24 students. It showed that few of these classes had significant enrollment by members of racial minorities. In addition the Proposal relied on what it called "anecdotal" reports from students regarding their "interaction in the classroom." The Proposal concluded that the University lacked a "critical mass" of minority students and that to remedy the deficiency it was necessary to give explicit consideration to race in the undergraduate admissions program.

To implement the Proposal the University included a student's race as a component of the PAI score, beginning with applicants in the fall of 2004. The University asks students to classify themselves from among five predefined racial categories on the application. Race is not assigned an explicit numerical value, but it is undisputed that race is a meaningful factor.

Once applications have been scored, they are plotted on a grid with the Academic Index on the x-axis and the Personal Achievement Index on the y-axis. On that grid students are assigned to so-called cells based on their individual scores. All students in the cells falling above a certain line are admitted. All students below the line are not. Each college—such as Liberal Arts or Engineering— admits students separately. So a student is considered initially for her first-choice college, then for her second choice, and finally for general admission as an undeclared major.

Petitioner applied for admission to the University's 2008

entering class and was rejected. She sued the University and various University officials in the United States District Court for the Western District of Texas. She alleged that the University's consideration of race in admissions violated the Equal Protection Clause. The parties cross-moved for summary judgment. The District Court granted summary judgment to the University. The United States Court of Appeals for the Fifth Circuit affirmed. It held that *Grutter* required courts to give substantial deference to the University, both in the definition of the compelling interest in diversity's benefits and in deciding whether its specific plan was narrowly tailored to achieve its stated goal. Applying that standard, the court upheld the University's admissions plan. 631 F. 3d 213, 217–218 (2011).

Over the dissent of seven judges, the Court of Appeals denied petitioner's request for rehearing en banc. See 644 F. 3d 301, 303 (CA5 2011) (*per curiam*). Petitioner sought a writ of certiorari. The writ was granted. 565 U. S. \_\_\_ (2012).

## B

Among the Court's cases involving racial classifications in education, there are three decisions that directly address the question of considering racial minority status as a positive or favorable factor in a university's admissions process, with the goal of achieving the educational benefits of a more diverse student body: *Bakke*, 438 U. S. 265; *Gratz*, *supra*; and *Grutter*, 539 U. S. 306. We take those cases as given for purposes of deciding this case.

We begin with the principal opinion authored by Justice Powell in *Bakke*, *supra*. In *Bakke*, the Court considered a system used by the medical school of the University of California at Davis. From an entering class of 100 students the school had set aside 16 seats for minority applicants. In holding this program impermissible under the Equal Protection Clause Justice Powell's opinion stated

certain basic premises. First, "decisions based on race or ethnic origin by faculties and administrations of state universities are reviewable under the Fourteenth Amendment." *Id.*, at 287 (separate opinion). The principle of equal protection admits no "artificial line of a 'two-class theory'" that "permits the recognition of special wards entitled to a degree of protection greater than that accorded others." *Id.*, at 295. It is therefore irrelevant that a system of racial preferences in admissions may seem benign. Any racial classification must meet strict scrutiny, for when government decisions "touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Id.*, at 299.

Next, Justice Powell identified one compelling interest that could justify the consideration of race: the interest in the educational benefits that flow from a diverse student body. Redressing past discrimination could not serve as a compelling interest, because a university's "broad mission [of] education" is incompatible with making the "judicial, legislative, or administrative findings of constitutional or statutory violations" necessary to justify remedial racial classification. *Id.*, at 307–309.

The attainment of a diverse student body, by contrast, serves values beyond race alone, including enhanced classroom dialogue and the lessening of racial isolation and stereotypes. The academic mission of a university is "a special concern of the First Amendment." *Id.*, at 312. Part of "'the business of a university [is] to provide that atmosphere which is most conducive to speculation, experiment, and creation,'" and this in turn leads to the question of "'who may be admitted to study.'" *Sweezy* v. *New Hampshire*, 354 U. S. 234, 263 (1957) (Frankfurter, J., concurring in judgment).

Justice Powell's central point, however, was that this

interest in securing diversity's benefits, although a permissible objective, is complex. "It is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students. The diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Bakke*, 438 U. S., at 315 (separate opinion).

In *Gratz*, 539 U. S. 244, and *Grutter, supra*, the Court endorsed the precepts stated by Justice Powell. In *Grutter*, the Court reaffirmed his conclusion that obtaining the educational benefits of "student body diversity is a compelling state interest that can justify the use of race in university admissions." *Id.*, at 325.

As *Gratz* and *Grutter* observed, however, this follows only if a clear precondition is met: The particular admissions process used for this objective is subject to judicial review. Race may not be considered unless the admissions process can withstand strict scrutiny. "Nothing in Justice Powell's opinion in *Bakke* signaled that a university may employ whatever means it desires to achieve the stated goal of diversity without regard to the limits imposed by our strict scrutiny analysis." *Gratz, supra*, at 275. "To be narrowly tailored, a race-conscious admissions program cannot use a quota system," *Grutter*, 539 U. S., at 334, but instead must "remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application," *id.,* at 337. Strict scrutiny requires the university to demonstrate with clarity that its "purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary . . . to the accomplishment of its purpose."

*Bakke*, 438 U. S., at 305 (opinion of Powell, J.) (internal quotation marks omitted).

While these are the cases that most specifically address the central issue in this case, additional guidance may be found in the Court's broader equal protection jurisprudence which applies in this context. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people," *Rice* v. *Cayetano*, 528 U. S. 495, 517 (2000) (internal quotation marks omitted), and therefore "are contrary to our traditions and hence constitutionally suspect," *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954). "'[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment,'" *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 505 (1989) (quoting *Fullilove* v. *Klutznick*, 448 U. S. 448, 533–534 (1980) (Stevens, J., dissenting)), "the Equal Protection Clause demands that racial classifications . . . be subjected to the 'most rigid scrutiny.'" *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967).

To implement these canons, judicial review must begin from the position that "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fullilove, supra,* at 523 (Stewart, J., dissenting); *McLaughlin* v. *Florida*, 379 U. S. 184, 192 (1964). Strict scrutiny is a searching examination, and it is the government that bears the burden to prove "'that the reasons for any [racial] classification [are] clearly identified and unquestionably legitimate,'" *Croson, supra*, at 505 (quoting *Fullilove*, 448 *supra*, at 533–535 (Stevens, J., dissenting)).

## II

*Grutter* made clear that racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." 539 U. S., at 326. And *Grutter* endorsed Justice Powell's conclusion in *Bakke* that

"the attainment of a diverse student body . . . is a constitutionally permissible goal for an institution of higher education." 438 U. S., at 311–312 (separate opinion). Thus, under *Grutter*, strict scrutiny must be applied to any admissions program using racial categories or classifications.

According to *Grutter*, a university's "educational judgment that such diversity is essential to its educational mission is one to which we defer." 539 U. S., at 328. *Grutter* concluded that the decision to pursue "the educational benefits that flow from student body diversity," *id.,* at 330, that the University deems integral to its mission is, in substantial measure, an academic judgment to which some, but not complete, judicial deference is proper under *Grutter*. A court, of course, should ensure that there is a reasoned, principled explanation for the academic decision. On this point, the District Court and Court of Appeals were correct in finding that *Grutter* calls for deference to the University's conclusion, "'based on its experience and expertise,'" 631 F. 3d, at 230 (quoting 645 F. Supp. 2d 587, 603 (WD Tex. 2009)), that a diverse student body would serve its educational goals. There is disagreement about whether *Grutter* was consistent with the principles of equal protection in approving this compelling interest in diversity. See *post,* at 1 (SCALIA, J., concurring); *post,* at 4–5 (THOMAS, J., concurring); *post,* at 1–2 (GINSBURG, J., dissenting). But the parties here do not ask the Court to revisit that aspect of *Grutter*'s holding.

A university is not permitted to define diversity as "some specified percentage of a particular group merely because of its race or ethnic origin." *Bakke, supra,* at 307 (opinion of Powell, J.). "That would amount to outright racial balancing, which is patently unconstitutional." *Grutter, supra,* at 330. "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'"

*Parents Involved in Community Schools* v. *Seattle School Dist. No. 1*, 551 U. S. 701, 732 (2007).

Once the University has established that its goal of diversity is consistent with strict scrutiny, however, there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation. The University must prove that the means chosen by the University to attain diversity are narrowly tailored to that goal. On this point, the University receives no deference. *Grutter* made clear that it is for the courts, not for university administrators, to ensure that "[t]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." 539 U. S., at 333 (internal quotation marks omitted). True, a court can take account of a university's experience and expertise in adopting or rejecting certain admissions processes. But, as the Court said in *Grutter*, it remains at all times the University's obligation to demonstrate, and the Judiciary's obligation to determine, that admissions processes "ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application." *Id*., at 337.

Narrow tailoring also requires that the reviewing court verify that it is "necessary" for a university to use race to achieve the educational benefits of diversity. *Bakke*, *supra,* at 305. This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications. Although "[n]arrow tailoring does not require exhaustion of every *conceivable* race-neutral alternative," strict scrutiny does require a court to examine with care, and not defer to, a university's "serious, good faith consideration of workable race-neutral alternatives." See *Grutter*, 539 U. S., at 339–340 (emphasis added). Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny:

The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If "'a nonracial approach . . . could promote the substantial interest about as well and at tolerable administrative expense,'" *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 280, n. 6 (1986) (quoting Greenawalt, Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions, 75 Colum. L. Rev. 559, 578–579 (1975)), then the university may not consider race. A plaintiff, of course, bears the burden of placing the validity of a university's adoption of an affirmative action plan in issue. But strict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice.

Rather than perform this searching examination, however, the Court of Appeals held petitioner could challenge only "whether [the University's] decision to reintroduce race as a factor in admissions was made in good faith." 631 F. 3d, at 236. And in considering such a challenge, the court would "presume the University acted in good faith" and place on petitioner the burden of rebutting that presumption. *Id.*, at 231–232. The Court of Appeals held that to "second-guess the merits" of this aspect of the University's decision was a task it was "ill-equipped to perform" and that it would attempt only to "ensure that [the University's] decision to adopt a race-conscious admissions policy followed from [a process of] good faith consideration." *Id.*, at 231. The Court of Appeals thus concluded that "the narrow-tailoring inquiry—like the compelling-interest inquiry—is undertaken with a degree of deference to the Universit[y]." *Id.,* at 232. Because "the efforts of the University have been studied, serious, and of high purpose," the Court of Appeals held that the use of race in the admissions program fell within "a constitutionally protected zone of discretion." *Id.,* at 231.

These expressions of the controlling standard are at odds with *Grutter*'s command that "all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny.'" 539 U. S., at 326 (quoting *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 227 (1995)). In *Grutter*, the Court approved the plan at issue upon concluding that it was not a quota, was sufficiently flexible, was limited in time, and followed "serious, good faith consideration of workable race-neutral alternatives." 539 U. S., at 339. As noted above, see *supra,* at 1, the parties do not challenge, and the Court therefore does not consider, the correctness of that determination.

*Grutter* did not hold that good faith would forgive an impermissible consideration of race. It must be remembered that "the mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight." *Croson*, 488 U. S., at 500. Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice.

The higher education dynamic does not change the narrow tailoring analysis of strict scrutiny applicable in other contexts. "[T]he analysis and level of scrutiny applied to determine the validity of [a racial] classification do not vary simply because the objective appears acceptable . . . . While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change." *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 724, n. 9 (1982).

The District Court and Court of Appeals confined the strict scrutiny inquiry in too narrow a way by deferring to the University's good faith in its use of racial classifications and affirming the grant of summary judgment on that basis. The Court vacates that judgment, but fairness

to the litigants and the courts that heard the case requires that it be remanded so that the admissions process can be considered and judged under a correct analysis. See *Adarand, supra,* at 237. Unlike *Grutter,* which was decided after trial, this case arises from cross-motions for summary judgment. In this case, as in similar cases, in determining whether summary judgment in favor of the University would be appropriate, the Court of Appeals must assess whether the University has offered sufficient evidence that would prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity. Whether this record—and not "simple . . . assurances of good intention," *Croson, supra,* at 500—is sufficient is a question for the Court of Appeals in the first instance.

\*    \*    \*

Strict scrutiny must not be "'strict in theory, but fatal in fact,'" *Adarand, supra,* at 237; see also *Grutter, supra,* at 326. But the opposite is also true. Strict scrutiny must not be strict in theory but feeble in fact. In order for judicial review to be meaningful, a university must make a showing that its plan is narrowly tailored to achieve the only interest that this Court has approved in this context: the benefits of a student body diversity that "encompasses a . . . broa[d] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Bakke,* 438 U. S., at 315 (opinion of Powell, J.). The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

—————

No. 11–345

—————

## ABIGAIL NOEL FISHER, PETITIONER *v.* UNIVERSITY OF TEXAS AT AUSTIN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE SCALIA, concurring.

I adhere to the view I expressed in *Grutter* v. *Bollinger*: "The Constitution proscribes government discrimination on the basis of race, and state-provided education is no exception." 539 U. S. 306, 349 (2003) (opinion concurring in part and dissenting in part). The petitioner in this case did not ask us to overrule *Grutter*'s holding that a "compelling interest" in the educational benefits of diversity can justify racial preferences in university admissions. Tr. of Oral Arg. 8–9. I therefore join the Court's opinion in full.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–345

_____

ABIGAIL NOEL FISHER, PETITIONER *v.* UNIVERSITY
OF TEXAS AT AUSTIN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE THOMAS, concurring.

I join the Court's opinion because I agree that the Court of Appeals did not apply strict scrutiny to the University of Texas at Austin's (University) use of racial discrimination in admissions decisions. *Ante,* at 1. I write separately to explain that I would overrule *Grutter* v. *Bollinger*, 539 U. S. 306 (2003), and hold that a State's use of race in higher education admissions decisions is categorically prohibited by the Equal Protection Clause.

## I

## A

The Fourteenth Amendment provides that no State shall "deny to any person . . . the equal protection of the laws." The Equal Protection Clause guarantees every person the right to be treated equally by the State, without regard to race. "At the heart of this [guarantee] lies the principle that the government must treat citizens as individuals, and not as members of racial, ethnic, or religious groups." *Missouri* v. *Jenkins*, 515 U. S. 70, 120–121 (1995) (THOMAS, J., concurring). "It is for this reason that we must subject all racial classifications to the strictest of scrutiny." *Id.*, at 121.

Under strict scrutiny, all racial classifications are categorically prohibited unless they are "'necessary to further

a compelling governmental interest'" and "narrowly tailored to that end." *Johnson* v. *California*, 543 U. S. 499, 514 (2005) (quoting *Grutter*, *supra,* at 327). This most exacting standard "has proven automatically fatal" in almost every case. *Jenkins*, *supra*, at 121 (THOMAS, J., concurring). And rightly so. "Purchased at the price of immeasurable human suffering, the equal protection principle reflects our Nation's understanding that [racial] classifications ultimately have a destructive impact on the individual and our society." *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 240 (1995) (THOMAS, J., concurring in part and concurring in judgment). "The Constitution abhors classifications based on race" because "every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Grutter*, *supra*, at 353 (THOMAS, J., concurring in part and dissenting in part).

## B

## 1

The Court first articulated the strict-scrutiny standard in *Korematsu* v. *United States*, 323 U. S. 214 (1944). There, we held that "[p]ressing public necessity may sometimes justify the existence of [racial discrimination]; racial antagonism never can." *Id.,* at 216.[1] Aside from *Grutter*, the Court has recognized only two instances in which a "[p]ressing public necessity" may justify racial discrimination by the government. First, in *Korematsu*, the Court recognized that protecting national security may satisfy this exacting standard. In that case, the Court upheld an evacuation order directed at "all persons of Japanese ancestry" on the grounds that the Nation was at war with Japan and that the order had "a definite and close rela-

---

[1] The standard of "pressing public necessity" is more frequently called a "compelling governmental interest." I use the terms interchangeably.

tionship to the prevention of espionage and sabotage." 323 U. S*.,* at 217–218. Second, the Court has recognized that the government has a compelling interest in remedying past discrimination for which it is responsible, but we have stressed that a government wishing to use race must provide "a 'strong basis in evidence for its conclusion that remedial action [is] necessary.'" *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 500, 504 (1989) (quoting *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 277 (1986) (plurality opinion)).

In contrast to these compelling interests that may, in a narrow set of circumstances, justify racial discrimination, the Court has frequently found other asserted interests insufficient. For example, in *Palmore* v. *Sidoti*, 466 U. S. 429 (1984), the Court flatly rejected a claim that the best interests of a child justified the government's racial discrimination. In that case, a state court awarded custody to a child's father because the mother was in a mixed-race marriage. The state court believed the child might be stigmatized by living in a mixed-race household and sought to avoid this perceived problem in its custody determination. We acknowledged the possibility of stigma but nevertheless concluded that "the reality of private biases and the possible injury they might inflict" do not justify racial discrimination. *Id.,* at 433. As we explained, "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Ibid.*

Two years later, in *Wygant, supra,* the Court held that even asserted interests in remedying societal discrimination and in providing role models for minority students could not justify governmentally imposed racial discrimination. In that case, a collective-bargaining agreement between a school board and a teacher's union favored teachers who were "'Black, American Indian, Oriental, or

of Spanish descendancy.'" *Id.,* at 270–271, and n. 2 (plurality opinion). We rejected the interest in remedying societal discrimination because it had no logical stopping point. *Id.,* at 276. We similarly rebuffed as inadequate the interest in providing role models to minority students and added that the notion that "black students are better off with black teachers could lead to the very system the Court rejected in *Brown* v. *Board of Education*, 347 U. S. 483 (1954)." *Ibid.*

2

*Grutter* was a radical departure from our strict-scrutiny precedents. In *Grutter*, the University of Michigan Law School (Law School) claimed that it had a compelling reason to discriminate based on race. The reason it advanced did not concern protecting national security or remedying its own past discrimination. Instead, the Law School argued that it needed to discriminate in admissions decisions in order to obtain the "educational benefits that flow from a diverse student body." 539 U. S., at 317. Contrary to the very meaning of strict scrutiny, the Court *deferred* to the Law School's determination that this interest was sufficiently compelling to justify racial discrimination. *Id.,* at 325.

I dissented from that part of the Court's decision. I explained that "only those measures the State must take to provide a bulwark against anarchy, or to prevent violence, will constitute a 'pressing public necessity'" sufficient to satisfy strict scrutiny. *Id.*, at 353. Cf. *Lee* v. *Washington*, 390 U. S. 333, 334 (1968) (Black, J., concurring) (protecting prisoners from violence might justify narrowly tailored discrimination); *J. A. Croson*, *supra*, at 521 (SCALIA, J., concurring in judgment) ("At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb . . . can justify [racial discrimination]"). I adhere to that view

today. As should be obvious, there is nothing "pressing" or "necessary" about obtaining whatever educational benefits may flow from racial diversity.

## II

## A

The University claims that the District Court found that it has a compelling interest in attaining "a diverse student body and the educational benefits flowing from such diversity." Brief for Respondents 18. The use of the conjunction, "and," implies that the University believes its discrimination furthers two distinct interests. The first is an interest in attaining diversity for its own sake. The second is an interest in attaining educational benefits that allegedly flow from diversity.

Attaining diversity for its own sake is a nonstarter. As even *Grutter* recognized, the pursuit of diversity as an end is nothing more than impermissible "racial balancing." 539 U. S., at 329–330 ("The Law School's interest is not simply 'to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin.' That would amount to outright racial balancing, which is patently unconstitutional" (quoting *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 307 (1978; citation omitted)); see also *id.*, at 307 ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids"). Rather, diversity can only be the *means* by which the University obtains educational benefits; it cannot be an end pursued for its own sake. Therefore, the *educational benefits* allegedly produced by diversity must rise to the level of a compelling state interest in order for the program to survive strict scrutiny.

Unfortunately for the University, the educational benefits flowing from student body diversity—assuming they exist—hardly qualify as a compelling state interest. In-

deed, the argument that educational benefits justify racial discrimination was advanced in support of racial segregation in the 1950's, but emphatically rejected by this Court. And just as the alleged educational benefits of segregation were insufficient to justify racial discrimination then, see *Brown* v. *Board of Education*, 347 U. S. 483 (1954), the alleged educational benefits of diversity cannot justify racial discrimination today.

1

Our desegregation cases establish that the Constitution prohibits public schools from discriminating based on race, even if discrimination is necessary to the schools' survival. In *Davis* v. *School Bd. of Prince Edward Cty.*, decided with *Brown*, *supra*, the school board argued that if the Court found segregation unconstitutional, white students would migrate to private schools, funding for public schools would decrease, and public schools would either decline in quality or cease to exist altogether. Brief for Appellees in *Davis* v. *School Bd. of Prince Edward Cty.*, O. T. 1952, No. 191, p. 30 (hereinafter Brief for Appellees in *Davis*) ("Virginians . . . would no longer permit sizeable appropriations for schools on either the State or local level; private segregated schools would be greatly increased in number and the masses of our people, both white and Negro, would suffer terribly. . . . [M]any white parents would withdraw their children from the public schools and, as a result, the program of providing better schools would be abandoned" (internal quotation marks omitted)). The true victims of desegregation, the school board asserted, would be black students, who would be unable to afford private school. See *id.*, at 31 ("[W]ith the demise of segregation, education in Virginia would receive a serious setback. Those who would suffer most would be the Negroes who, by and large, would be economically less able to afford the private school"); Tr. of Oral Arg. in *Davis* v. *School Bd. of Prince*

*Edward Cty.,* O. T. 1954, No. 3, p. 208 ("What is worst of all, in our opinion, you impair the public school system of Virginia and the victims will be the children of both races, we think the Negro race worse than the white race, because the Negro race needs it more by virtue of these disadvantages under which they have labored. We are up against the proposition: What does the Negro profit if he procures an immediate detailed decree from this Court now and then impairs or mars or destroys the public school system in Prince Edward County").[2]

Unmoved by this sky-is-falling argument, we held that segregation violates the principle of equality enshrined in the Fourteenth Amendment. See *Brown*, *supra*, at 495 ("[I]n the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal"); see also *Allen* v. *School Bd. of Prince Edward Cty.*, 249 F. 2d 462, 465 (CA4 1957) (*per curiam*) ("The fact that the schools might be closed if the order were enforced is no reason for not enforcing it. A person

_____

[2] Similar arguments were advanced unsuccessfully in other cases as well. See, *e.g.,* Brief for Respondents in *Sweatt* v. *Painter*, O. T. 1949, No. 44, pp. 94–95 (hereinafter Brief for Respondents in *Sweatt*) ("[I]f the power to separate the students were terminated, . . . it would be as a bonanza to the private white schools of the State, and it would mean the migration out of the schools and the turning away from the public schools of the influence and support of a large number of children and of the parents of those children . . . who are the largest contributors to the cause of public education, and whose financial support is necessary for the continued progress of public education. . . . Should the State be required to mix the public schools, there is no question but that a very large group of students would transfer, or be moved by their parents, to private schools with a resultant deterioration of the public schools" (internal quotation marks omitted)); Brief for Appellees in *Briggs* v. *Elliott*, O. T. 1952, No. 101, p. 27 (hereinafter Brief for Appellees in *Briggs*) ("[I]t would be impossible to have sufficient acceptance of the idea of mixed groups attending the same schools to have public education on that basis at all . . . . [I]t would eliminate the public schools in most, if not all, of the communities in the State").

may not be denied enforcement of rights to which he is entitled under the Constitution of the United States because of action taken or threatened in defiance of such rights"). Within a matter of years, the warning became reality: After being ordered to desegregate, Prince Edward County closed its public schools from the summer of 1959 until the fall of 1964. See R. Sarratt, The Ordeal of Desegregation 237 (1966). Despite this fact, the Court never backed down from its rigid enforcement of the Equal Protection Clause's antidiscrimination principle.

In this case, of course, Texas has not alleged that the University will close if it is prohibited from discriminating based on race. But even if it had, the foregoing cases make clear that even that consequence would not justify its use of racial discrimination. It follows, *a fortiori*, that the putative educational benefits of student body diversity cannot justify racial discrimination: If a State does not have a compelling interest in the *existence* of a university, it certainly cannot have a compelling interest in the supposed benefits that might accrue to that university from racial discrimination. See *Grutter*, 539 U. S., at 361 (opinion of THOMAS, J.) ("[A] marginal improvement in legal education cannot justify racial discrimination where the Law School has no compelling interest either in its existence or in its current educational and admissions policies"). If the Court were actually applying strict scrutiny, it would require Texas either to close the University or to stop discriminating against applicants based on their race. The Court has put other schools to that choice, and there is no reason to treat the University differently.

2

It is also noteworthy that, in our desegregation cases, we rejected arguments that are virtually identical to those advanced by the University today. The University asserts, for instance, that the diversity obtained through its dis-

criminatory admissions program prepares its students to become leaders in a diverse society. See, *e.g.,* Brief for Respondents 6 (arguing that student body diversity "prepares students to become the next generation of leaders in an increasingly diverse society"). The segregationists likewise defended segregation on the ground that it provided more leadership opportunities for blacks. See, *e.g.,* Brief for Respondents in *Sweatt* 96 ("[A] very large group of Northern Negroes [comes] South to attend separate colleges, suggesting that the Negro does not secure as well-rounded a college life at a mixed college, and that the separate college offers him positive advantages; that there is a more normal social life for the Negro in a separate college; that there is a greater opportunity for full participation and for the development of leadership; that the Negro is inwardly more 'secure' at a college of his own people"); Brief for Appellees in *Davis* 25–26 ("The Negro child gets an opportunity to participate in segregated schools that I have never seen accorded to him in non-segregated schools. He is important, he holds offices, he is accepted by his fellows, he is on athletic teams, he has a full place there" (internal quotation marks omitted)). This argument was unavailing. It is irrelevant under the Fourteenth Amendment whether segregated or mixed schools produce better leaders. Indeed, no court today would accept the suggestion that segregation is permissible because historically black colleges produced Booker T. Washington, Thurgood Marshall, Martin Luther King, Jr., and other prominent leaders. Likewise, the University's racial discrimination cannot be justified on the ground that it will produce better leaders.

The University also asserts that student body diversity improves interracial relations. See, *e.g.,* Brief for Respondents 6 (arguing that student body diversity promotes "cross-racial understanding" and breaks down racial and ethnic stereotypes). In this argument, too, the University

repeats arguments once marshaled in support of segregation. See, *e.g.,* Brief for Appellees in *Davis* 17 ("Virginia has established segregation in certain fields as a part of her public policy to prevent violence and reduce resentment. The result, in the view of an overwhelming Virginia majority, has been to improve the relationship between the different races"); *id.,* at 25 ("If segregation be stricken down, the general welfare will be definitely harmed . . . there would be more friction developed" (internal quotation marks omitted)); Brief for Respondents in *Sweatt* 93 ("Texas has had no serious breaches of the peace in recent years in connection with its schools. The separation of the races has kept the conflicts at a minimum"); *id.,* at 97–98 ("The legislative acts are based not only on the belief that it is the best way to provide education for both races, and the knowledge that separate schools are necessary to keep public support for the public schools, but upon the necessity to maintain the public peace, harmony, and welfare"); Brief for Appellees in *Briggs* 32 ("The southern Negro, by and large, does not want an end to segregation in itself any more than does the southern white man. The Negro in the South knows that discriminations, and worse, can and would multiply in such event" (internal quotation marks omitted)). We flatly rejected this line of arguments in *McLaurin* v. *Oklahoma State Regents for Higher Ed.*, 339 U. S. 637 (1950), where we held that segregation would be unconstitutional even if white students never tolerated blacks. *Id.,* at 641 ("It may be argued that appellant will be in no better position when these restrictions are removed, for he may still be set apart by his fellow students. This we think irrelevant. There is a vast difference—a Constitutional difference—between restrictions imposed by the state which prohibit the intellectual commingling of students, and the refusal of individuals to commingle where the state presents no such bar"). It is, thus, entirely irrele-

vant whether the University's racial discrimination increases or decreases tolerance.

Finally, while the University admits that racial discrimination in admissions is not ideal, it asserts that it is a temporary necessity because of the enduring race consciousness of our society. See Brief for Respondents 53–54 ("Certainly all aspire for a colorblind society in which race does not matter . . . .  But in Texas, as in America, 'our highest aspirations are yet unfulfilled'").  Yet again, the University echoes the hollow justifications advanced by the segregationists. See, *e.g.,* Brief for State of Kansas on Reargument in *Brown* v. *Board of Education*, O. T. 1953, No. 1, p. 56 ("We grant that segregation may not be the ethical or political ideal.  At the same time we recognize that practical considerations may prevent realization of the ideal"); Brief for Respondents in *Sweatt* 94 ("The racial consciousness and feeling which exists today in the minds of many people may be regrettable and unjustified.  Yet they are a reality which must be dealt with by the State if it is to preserve harmony and peace and at the same time furnish equal education to both groups"); *id.,* at 96 ("'[T]he *mores* of racial relationships are such as to rule out, for the present at least, any possibility of admitting white persons and Negroes to the same institutions'"); Brief for Appellees in *Briggs* 26–27 ("[I]t would be unwise in administrative practice . . . to mix the two races in the same schools at the present time and under present conditions"); Brief for Appellees on Reargument in *Briggs* v. *Elliott*, O. T. 1953, No. 2, p. 79 ("It is not 'racism' to be cognizant of the fact that mankind has struggled with race problems and racial tensions for upwards of sixty centuries").  But these arguments too were unavailing.  The Fourteenth Amendment views racial bigotry as an evil to be stamped out, not as an excuse for perpetual racial tinkering by the State. See *DeFunis* v. *Odegaard*, 416 U. S. 312, 342 (1974) (Douglas, J., dissenting) ("The Equal Protection Clause commands the elimination of racial barriers, not

their creation in order to satisfy our theory as to how society ought to be organized"). The University's arguments to this effect are similarly insufficient to justify discrimination.[3]

### 3

The University's arguments today are no more persuasive than they were 60 years ago. Nevertheless, despite rejecting identical arguments in *Brown*, the Court in *Grutter* deferred to the University's determination that the diversity obtained by racial discrimination would yield educational benefits. There is no principled distinction between the University's assertion that diversity yields educational benefits and the segregationists' assertion that segregation yielded those same benefits. See *Grutter*, 539 U. S., at 365–366 (opinion of THOMAS, J.) ("Contained within today's majority opinion is the seed of a new constitutional justification for a concept I thought long and rightly rejected—racial segregation"). Educational benefits are a far cry from the truly compelling state interests that we previously required to justify use of racial classifications.

### B

My view of the Constitution is the one advanced by the plaintiffs in *Brown*: "[N]o State has any authority under

_____

[3] While the arguments advanced by the University in defense of discrimination are the same as those advanced by the segregationists, one obvious difference is that the segregationists argued that it was *segregation* that was necessary to obtain the alleged benefits, whereas the University argues that *diversity* is the key. Today, the segregationists' arguments would never be given serious consideration. But see M. Plocienniczak, Pennsylvania School Experiments with 'Segregation,' CNN (Jan. 27, 2011), http://www.cnn.com/2011/US/01/27/pennsylvania.segregation/index.html?_s=PM:US (as visited June 21, 2013, and available in Clerk of Court's case file). We should be equally hostile to the University's repackaged version of the same arguments in support of its favored form of racial discrimination.

the equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens." Tr. of Oral Arg. in *Brown* v. *Board of Education*, O. T. 1952, No. 8, p. 7; see also Juris. Statement in *Davis* v. *School Bd. of Prince Edward Cty.,* O. T. 1952, No. 191, p. 8 ("[W]e take the unqualified position that the Fourteenth Amendment has totally stripped the state of power to make race and color the basis for governmental action"); Brief for Appellants in *Brown* v. *Board of Education*, O. T. 1952, No. 8, p. 5 ("The Fourteenth Amendment precludes a state from imposing distinctions or classifications based upon race and color alone"); Brief for Appellants in Nos. 1, 2, and 4, and for Respondents in No. 10 on Reargument in *Brown* v. *Board of Education*, O. T. 1953, p. 65 ("That the Constitution is color blind is our dedicated belief"). The Constitution does not pander to faddish theories about whether race mixing is in the public interest. The Equal Protection Clause strips States of all authority to use race as a factor in providing education. All applicants must be treated equally under the law, and no benefit in the eye of the beholder can justify racial discrimination.

This principle is neither new nor difficult to understand. In 1868, decades before *Plessy*, the Iowa Supreme Court held that schools may not discriminate against applicants based on their skin color. In *Clark* v. *Board of Directors*, 24 Iowa 266 (1868), a school denied admission to a student because she was black, and "public sentiment [was] opposed to the intermingling of white and colored children in the same schools." *Id.,* at 269. The Iowa Supreme Court rejected that flimsy justification, holding that "all the youths are equal before the law, and there is no discretion vested in the board . . . or elsewhere, to interfere with or disturb that equality." *Id.,* at 277. "For the courts to sustain a board of school directors . . . in limiting the rights and privileges of persons by reason of their [race],

would be to sanction a plain violation of the spirit of our laws not only, but would tend to perpetuate the national differences of our people and stimulate a constant strife, if not a war of races." *Id.,* at 276. This simple, yet fundamental, truth was lost on the Court in *Plessy* and *Grutter*.

I would overrule *Grutter* and hold that the University's admissions program violates the Equal Protection Clause because the University has not put forward a compelling interest that could possibly justify racial discrimination.

## III

While I find the theory advanced by the University to justify racial discrimination facially inadequate, I also believe that its use of race has little to do with the alleged educational benefits of diversity. I suspect that the University's program is instead based on the benighted notion that it is possible to tell when discrimination helps, rather than hurts, racial minorities. See *post,* at 3 (GINSBURG, J., dissenting) ("[G]overnment actors, including state universities, need not be blind to the lingering effects of 'an overtly discriminatory past,' the legacy of 'centuries of law-sanctioned inequality'"). But "[h]istory should teach greater humility." *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 609 (1990) (O'Connor, J., dissenting). The worst forms of racial discrimination in this Nation have always been accompanied by straight-faced representations that discrimination helped minorities.

### A

Slaveholders argued that slavery was a "positive good" that civilized blacks and elevated them in every dimension of life. See, *e.g.,* Calhoun, Speech in the U. S. Senate, 1837, in P. Finkelman, Defending Slavery 54, 58–59 (2003) ("Never before has the black race of Central Africa, from the dawn of history to the present day, attained a condition so civilized and so improved, not only physically,

but morally and intellectually. . . . [T]he relation now existing in the slaveholding States between the two [races], is, instead of an evil, a good—a positive good"); Harper, Memoir on Slavery, in The Ideology of Slavery 78, 115–116 (D. Faust ed. 1981) ("Slavery, as it is said in an eloquent article published in a Southern periodical work . . . 'has done more to elevate a degraded race in the scale of humanity; to tame the savage; to civilize the barbarous; to soften the ferocious; to enlighten the ignorant, and to spread the blessings of [C]hristianity among the heathen, than all the missionaries that philanthropy and religion have ever sent forth'"); Hammond, The Mudsill Speech, 1858, in Defending Slavery, *supra*, at 80, 87 ("They are elevated from the condition in which God first created them, by being made our slaves").

A century later, segregationists similarly asserted that segregation was not only benign, but good for black students. They argued, for example, that separate schools protected black children from racist white students and teachers. See, *e.g.,* Brief for Appellees in *Briggs* 33–34 ("'I have repeatedly seen wise and loving colored parents take infinite pains to force their little children into schools where the white children, white teachers, and white parents despised and resented the dark child, made mock of it, neglected or bullied it, and literally rendered its life a living hell. Such parents want their child to "fight" this thing out,—but, dear God, at what a cost! . . . We shall get a finer, better balance of spirit; an infinitely more capable and rounded personality by putting children in schools where they are wanted, and where they are happy and inspired, than in thrusting them into hells where they are ridiculed and hated'" (quoting DuBois, Does the Negro Need Separate Schools? 4 J. of Negro Educ. 328, 330–331 (1935))); Tr. of Oral Arg. in *Bolling* v. *Sharpe*, O. T. 1952, No. 413, p. 56 ("There was behind these [a]cts a kindly feeling [and] an intention to help these people who had

been in bondage. And there was and there still is an intention by the Congress to see that these children shall be educated in a healthful atmosphere, in a wholesome atmosphere, in a place where they are wanted, in a place where they will not be looked upon with hostility, in a place where there will be a receptive atmosphere for learning for both races without the hostility that undoubtedly Congress thought might creep into these situations"). And they even appealed to the fact that many blacks agreed that separate schools were in the "best interests" of both races. See, *e.g.,* Brief for Appellees in *Davis* 24–25 ("'It has been my experience, in working with the people of Virginia, including both white and Negro, that the customs and the habits and the traditions of Virginia citizens are such that they believe for the best interests of both the white and the Negro that the separate school is best'").

Following in these inauspicious footsteps, the University would have us believe that its discrimination is likewise benign. I think the lesson of history is clear enough: Racial discrimination is never benign. "'[B]enign' carries with it no independent meaning, but reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable." See *Metro Broadcasting*, 497 U. S., at 610 (O'Connor, J., dissenting). It is for this reason that the Court has repeatedly held that strict scrutiny applies to *all* racial classifications, regardless of whether the government has benevolent motives. See, *e.g., Johnson*, 543 U. S., at 505 ("We have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications"); *Adarand*, 515 U. S., at 227 ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny"); *J. A. Croson*, 488 U. S., at 500 ("Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot

suffice"). The University's professed good intentions cannot excuse its outright racial discrimination any more than such intentions justified the now denounced arguments of slaveholders and segregationists.

### B

While it does not, for constitutional purposes, matter whether the University's racial discrimination is benign, I note that racial engineering does in fact have insidious consequences. There can be no doubt that the University's discrimination injures white and Asian applicants who are denied admission because of their race. But I believe the injury to those admitted under the University's discriminatory admissions program is even more harmful.

Blacks and Hispanics admitted to the University as a result of racial discrimination are, on average, far less prepared than their white and Asian classmates. In the University's entering class of 2009, for example, among the students admitted outside the Top Ten Percent plan, blacks scored at the 52d percentile of 2009 SAT takers nationwide, while Asians scored at the 93d percentile. Brief for Richard Sander et al. as *Amici Curiae* 3–4, and n. 4. Blacks had a mean GPA of 2.57 and a mean SAT score of 1524; Hispanics had a mean GPA of 2.83 and a mean SAT score of 1794; whites had a mean GPA of 3.04 and a mean SAT score of 1914; and Asians had a mean GPA of 3.07 and a mean SAT score of 1991.[4] *Ibid.*

Tellingly, neither the University nor any of the 73 *amici* briefs in support of racial discrimination has presented a shred of evidence that black and Hispanic students are able to close this substantial gap during their time at the University. Cf. Thernstrom & Thernstrom, Reflections on the Shape of the River, 46 UCLA L. Rev. 1583, 1605–1608 (1999) (discussing the failure of defenders of racial dis-

––––––––

[4] The lowest possible score on the SAT is 600, and the highest possible score is 2400.

crimination in admissions to consider the fact that its "beneficiaries" are underperforming in the classroom). "It is a fact that in virtually all selective schools . . . where racial preferences in admission is practiced, the majority of [black] students end up in the lower quarter of their class." S. Cole & E. Barber, Increasing Faculty Diversity: The Occupational Choices of High-Achieving Minority Students 124 (2003). There is no reason to believe this is not the case at the University. The University and its dozens of *amici* are deafeningly silent on this point.

Furthermore, the University's discrimination does nothing to increase the number of blacks and Hispanics who have access to a college education generally. Instead, the University's discrimination has a pervasive shifting effect. See T. Sowell, Affirmative Action Around the World 145–146 (2004). The University admits minorities who otherwise would have attended less selective colleges where they would have been more evenly matched. But, as a result of the mismatching, many blacks and Hispanics who likely would have excelled at less elite schools are placed in a position where underperformance is all but inevitable because they are less academically prepared than the white and Asian students with whom they must compete. Setting aside the damage wreaked upon the self-confidence of these overmatched students, there is no evidence that they learn more at the University than they would have learned at other schools for which they were better prepared. Indeed, they may learn less.

The Court of Appeals believed that the University needed to enroll more blacks and Hispanics because they remained "clustered in certain programs." 631 F. 3d 213, 240 (CA5 2011) ("[N]early a quarter of the undergraduate students in [the University's] College of Social Work are Hispanic, and more than 10% are [black]. In the College of Education, 22.4% of students are Hispanic and 10.1% are [black]"). But racial discrimination may be the cause

of, not the solution to, this clustering. There is some evidence that students admitted as a result of racial discrimination are more likely to abandon their initial aspirations to become scientists and engineers than are students with similar qualifications who attend less selective schools. See, *e.g.,* Elliott, Strenta, Adair, Matier, & Scott, The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions, 37 Research in Higher Educ. 681, 699–701 (1996).[5] These students may well drift towards less competitive majors because the mismatch caused by racial discrimination in admissions makes it difficult for them to compete in more rigorous majors.

Moreover, the University's discrimination "stamp[s] [blacks and Hispanics] with a badge of inferiority." *Adarand*, 515 U. S., at 241 (opinion of THOMAS, J.). It taints the accomplishments of all those who are admitted as a result of racial discrimination. Cf. J. McWhorter, Losing the Race: Self-Sabotage in Black America 248 (2000) ("I was never able to be as proud of getting into Stanford as my classmates could be. . . . [H]ow much of an achievement can I truly say it was to have been a good enough *black* person to be admitted, while my colleagues had been considered good enough *people* to be admitted"). And, it taints the accomplishments of all those who are the

––––––––––

[5] The success of historically black colleges at producing graduates who go on to earn graduate degrees in science and engineering is well documented. See, *e.g.,* National Science Foundation, J. Burrelli & A. Rapoport, InfoBrief, Role of HBCUs as Baccalaureate-Origin Institutions of Black S&E Doctorate Recipients 6 (2008) (Table 2) (showing that, from 1997–2006, Howard University had more black students who went on to earn science and engineering doctorates than any other undergraduate institution, and that 7 other historically black colleges ranked in the top 10); American Association of Medical Colleges, Diversity in Medical Education: Facts & Figures 86 (2012) (Table 19) (showing that, in 2011, Xavier University had more black students who went on to earn medical degrees than any other undergraduate institution and that Howard University was second).

same race as those admitted as a result of racial discrimination. In this case, for example, most blacks and Hispanics attending the University were admitted without discrimination under the Top Ten Percent plan, but no one can distinguish those students from the ones whose race played a role in their admission. "When blacks [and Hispanics] take positions in the highest places of government, industry, or academia, it is an open question . . . whether their skin color played a part in their advancement." See *Grutter*, 539 U. S., at 373 (opinion of THOMAS, J.). "The question itself is the stigma—because either racial discrimination did play a role, in which case the person may be deemed 'otherwise unqualified,' or it did not, in which case asking the question itself unfairly marks those . . . who would succeed without discrimination." *Ibid.* Although cloaked in good intentions, the University's racial tinkering harms the very people it claims to be helping.

*      *      *

For the foregoing reasons, I would overrule *Grutter*. However, because the Court correctly concludes that the Court of Appeals did not apply strict scrutiny, I join its opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 11–345

_____

ABIGAIL NOEL FISHER, PETITIONER *v.* UNIVERSITY
OF TEXAS AT AUSTIN ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 24, 2013]

JUSTICE GINSBURG, dissenting.

The University of Texas at Austin (University) is candid about what it is endeavoring to do: It seeks to achieve student-body diversity through an admissions policy patterned after the Harvard plan referenced as exemplary in Justice Powell's opinion in *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 316–317 (1978). The University has steered clear of a quota system like the one struck down in *Bakke*, which excluded all nonminority candidates from competition for a fixed number of seats. See *id.*, at 272–275, 315, 319–320 (opinion of Powell, J.). See also *Gratz* v. *Bollinger*, 539 U. S. 244, 293 (2003) (Souter, J., dissenting) ("Justice Powell's opinion in [*Bakke*] rules out a racial quota or set-aside, in which race is the sole fact of eligibility for certain places in a class."). And, like so many educational institutions across the Nation,[1] the University has taken care to follow the model approved by the Court in *Grutter* v. *Bollinger*, 539 U. S. 306 (2003). See 645

_____

[1] See Brief for Amherst College et al. as *Amici Curiae* 33–35; Brief for Association of American Law Schools as *Amicus Curiae* 6; Brief for Association of American Medical Colleges et al. as *Amici Curiae* 30–32; Brief for Brown University et al. as *Amici Curiae* 2–3, 13; Brief for Robert Post et al. as *Amici Curiae* 24–27; Brief for Fordham University et al. as *Amici Curiae* 5–6; Brief for University of Delaware et al. as *Amici Curiae* 16–21.

F. Supp. 2d 587, 609 (WD Tex. 2009) ("[T]he parties agree [that the University's] policy was based on the [admissions] policy [upheld in *Grutter*].").

Petitioner urges that Texas' Top Ten Percent Law and race-blind holistic review of each application achieve significant diversity, so the University must be content with those alternatives. I have said before and reiterate here that only an ostrich could regard the supposedly neutral alternatives as race unconscious. See *Gratz*, 539 U. S., at 303–304, n. 10 (dissenting opinion). As Justice Souter observed, the vaunted alternatives suffer from "the disadvantage of deliberate obfuscation." *Id.*, at 297–298 (dissenting opinion).

Texas' percentage plan was adopted with racially segregated neighborhoods and schools front and center stage. See House Research Organization, Bill Analysis, HB 588, pp. 4–5 (Apr. 15, 1997) ("Many regions of the state, school districts, and high schools in Texas are still predominantly composed of people from a single racial or ethnic group. Because of the persistence of this segregation, admitting the top 10 percent of all high schools would provide a diverse population and ensure that a large, well qualified pool of minority students was admitted to Texas universities."). It is race consciousness, not blindness to race, that drives such plans.[2] As for holistic review, if universities cannot explicitly include race as a factor, many may "resort to camouflage" to "maintain their minority enrollment." *Gratz*, 539 U. S., at 304 (GINSBURG, J., dissenting).

_____

[2] The notion that Texas' Top Ten Percent Law is race neutral calls to mind Professor Thomas Reed Powell's famous statement: "If you think that you can think about a thing inextricably attached to something else without thinking of the thing which it is attached to, then you have a legal mind." T. Arnold, The Symbols of Government 101 (1935) (internal quotation marks omitted). Only that kind of legal mind could conclude that an admissions plan specifically designed to produce racial diversity is not race conscious.

GINSBURG, J., dissenting

I have several times explained why government actors, including state universities, need not be blind to the lingering effects of "an overtly discriminatory past," the legacy of "centuries of law-sanctioned inequality." *Id.*, at 298 (dissenting opinion). See also *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 272–274 (1995) (dissenting opinion). Among constitutionally permissible options, I remain convinced, "those that candidly disclose their consideration of race [are] preferable to those that conceal it." *Gratz*, 539 U. S., at 305, n. 11 (dissenting opinion).

Accordingly, I would not return this case for a second look. As the thorough opinions below show, 631 F. 3d 213 (CA5 2011); 645 F. Supp. 2d 587, the University's admissions policy flexibly considers race only as a "factor of a factor of a factor of a factor" in the calculus, *id.*, at 608; followed a yearlong review through which the University reached the reasonable, good-faith judgment that supposedly race-neutral initiatives were insufficient to achieve, in appropriate measure, the educational benefits of student-body diversity, see 631 F. 3d, at 225–226; and is subject to periodic review to ensure that the consideration of race remains necessary and proper to achieve the University's educational objectives, see *id.*, at 226.[3] Justice Powell's opinion in *Bakke* and the Court's decision in *Grutter* require no further determinations. See *Grutter*,

———————

[3] As the Court said in *Grutter* v. *Bollinger*, 539 U. S. 306, 339 (2003), "[n]arrow tailoring . . . require[s] serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." But, *Grutter* also explained, it does not "require a university to choose between maintaining a reputation for excellence [and] fulfilling a commitment to provide educational opportunities to members of all racial groups." *Ibid.* I do not read the Court to say otherwise. See *ante*, at 10 (acknowledging that, in determining whether a race-conscious admissions policy satisfies *Grutter*'s narrow-tailoring requirement, "a court can take account of a university's experience and expertise in adopting or rejecting certain admissions processes").

539 U. S., at 333–343; *Bakke*, 438 U. S., at 315–320.

The Court rightly declines to cast off the equal protection framework settled in *Grutter*. See *ante*, at 5. Yet it stops short of reaching the conclusion that framework warrants. Instead, the Court vacates the Court of Appeals' judgment and remands for the Court of Appeals to "assess whether the University has offered sufficient evidence [to] prove that its admissions program is narrowly tailored to obtain the educational benefits of diversity." *Ante*, at 13. As I see it, the Court of Appeals has already completed that inquiry, and its judgment, trained on this Court's *Bakke* and *Grutter* pathmarkers, merits our approbation.[4]

\*     \*     \*

For the reasons stated, I would affirm the judgment of the Court of Appeals.

––––––––––

[4] Because the University's admissions policy, in my view, is constitutional under *Grutter*, there is no need for the Court in this case "to revisit whether all governmental classifications by race, whether designed to benefit or to burden a historically disadvantaged group, should be subject to the same standard of judicial review." 539 U. S., at 346, n. (GINSBURG, J., concurring). See also *Gratz* v. *Bollinger*, 539 U. S. 244, 301 (2003) (GINSBURG, J., dissenting) ("Actions designed to burden groups long denied full citizenship stature are not sensibly ranked with measures taken to hasten the day when entrenched discrimination and its aftereffects have been extirpated.").