### CLARK v. THE BOARD OF DIRECTORS, ETC.

I. Per COLE, J., DILLON, Ch. J., and BECK, J., concurring.

1. Mandamus: DISCRETION: SCHOOL BOARD. Where a discretion is left to a board of school directors, it cannot be controlled by mandamus, though the discretion be unwisely exercised.

2. Schools: COLORED CHILDREN: DISCRETION OF DISTRICT BOARD. The Constitution and statutes in force effectuating it (Const. art. 9, § 12; Rev. § 2023, *et seq.*; Laws of 1862, ch. 192, § 12; Laws of 1866, ch. 143, § 3) provide for the education of all the youths of the State, without distinction of color ; and the board of directors have no dis-

. cretionary power to require colored children to attend a separate school. They may exercise a uniform discretion, operative upon all, as to the residence or qualification of children to entitle them to admission to each particular school, but they cannot deny a youth admission to any particular school, because of his color, nationality, religion, or the like.

II. Per WRIGHT, J., dissenting.

3. —— While the Constitution and laws provide for the education of all the youths of the State, without distinction of color, by a system of common schools, the board of directors have a discretion in arranging the schools, and directing where the children shall attend ; and in the exercise of this discretion they may provide, if deemed promotive of the welfare, and for the best interests, of the schools, a separate school for colored children, provided they are kept within the proper districts, and have furnished to them the necessary and suitable instruction furnished other children. The equality contemplated by the Constitution and laws is preserved if equal school privileges be thus furnished, and is in no sense disturbed by the exercise of such discretion on the part of the board.

*Appeal from Muscatine District Court.*

TUESDAY, APRIL 14.

MANDAMUS. — The petition sets forth, that plaintiff, Susan B. Clark, was born in the city of Muscatine, and has continued to reside therein up to the present time ; that she is now twelve years of age, and sues by her next friend, her father, Alexander Clark, who is a resident freeholder and tax payer in the said city of Muscatine, and has been for many years past ; that said city of Muscatine is an independent school-district, and the defendants, the board of directors, have established and maintained schools in said independent district; that one of said

schools is designated as "Grammar School No. 2," and plaintiff resides in the neighborhood thereof, and within that portion of said district from which resident youths of the requisite age attend said school, and that she is duly qualified for admission into said grammar school, as a pupil; that it is the duty of said board, resulting from their office, to so admit her; that, on the 10th day of September, 1867, said school being in session, she presented herself, and demanded to be received therein as a scholar under the common school law; that said defendants refused to admit or receive her as a pupil, but illegally excluded her therefrom. She asks for a mandamus to compel the defendants to so admit her.

The answer, in effect, admits the statements of the petition as to plaintiff's birth, residence, age, application for admission, their refusal to admit her, etc. The defendants then aver, that the plaintiff is of negro extraction and belongs to the "colored race;" that since the organization of said school-district there has been, and they have now, therein, and had, when plaintiff applied for admission, a separate school for colored children, in a comfortable building, with proper furniture and provided with a competent teacher; that plaintiff had attended said school for colored children up to the time she demanded admission to the grammar school; that, before this suit was brought, they proposed to the plaintiff's father to create a grammar class in said colored school, for the instruction of the plaintiff, and to put in charge thereof a competent teacher; that public sentiment in said independent district is opposed to the intermingling of white and colored children in the same schools, and the best interests of both races require them to be educated in separate schools. The defendants also set up, that, by the power to establish additional schools, etc., and the discretionary power in relation thereto, given

them by the school law, they had and have the right to require the colored children to attend such separate school.

To this answer the plaintiff demurred, in substance, because the same constituted no defense to plaintiff's claim. The District Court sustained the demurrer, and the defendants appeal.

The counsel for the respective parties agree, that the question presented by the record, and the point upon which the determination must rest, and upon which they wish a decision of the court, is, whether the board of directors of a school-district has the right to require colored children to attend a separate school.

*William F. Brannon* for the appellants.

*Richman & Carskadden* and *Henry O'Connor* for the appellee.

COLE, J. — In view of the principle of equal rights to all, upon which our government is founded, it would seem necessary, in order to justify a denial of such equality of right to any one, that some express sovereign authority for such denial should be shown.

1. MANDAMUS: discretion: school board.

But it is claimed, that, since the board of directors are authorized and empowered to have as many schools in their district township as they may deem proper, and are charged with a discretion in their control and management, they may, therefore, establish schools for colored children, and require such to attend them, or none. And, in this particular case, the fact, that public sentiment is opposed to the intermingling of white and colored children in the same schools, is presented as a justification for the exercise of the discretion in the

establishing and maintaining of a separate school for the colored children. Whether such a public sentiment would amount to a justification or not, it is not necessary to now inquire ; for, if the board of directors have a discretion in that particular matter, their discretion cannot be controlled by mandamus, whether they have exercised it wisely or unwisely (Rev. § 3763).

To determine whether the right claimed by plaintiff is a clear and absolute legal right, or one dependent upon the discretion of the board of directors, we must look to the statute. And we can the more unmistakably construe the statute when we examine it in the light of the legislative history in relation to the same subject-matter.

Our first State Constitution was adopted in 1846. At the first session of the general assembly of the State, a
2. Schools: colored children: discretion. law on the subject of common schools was passed, in which it was enacted that the "school shall be open and free alike to all *white* persons in the district between the ages of five and twenty-one years." * * * Laws of 1846, ch. 99, § 6.

In 1848, at the second regular session of the general assembly, an act was passed to "establish a system of common schools," and by which all other acts were repealed ; by this act it was provided that the secretary of the district should "take and keep on record a list of the names of all the *white* persons in the district between the ages of five and twenty-one years, and shall deliver a copy of the same to the principal teacher," etc. Laws of 1848, ch. 80, § 51.

By the Code of 1851, the provisions of the last mentioned law were re-enacted. Code of 1851, § 1127. And it was also provided by the Code of 1851, that "all real and personal property of blacks and mulattos in this State shall be exempt from taxation for school purposes." § 1160.

By the new Constitution, which was adopted in 1857, the educational interests of the State, including common schools, were placed under the management of a board of education. The general assembly was, however, clothed with the power to abolish or reorganize said board of education, after the year 1863. This power was exercised and the board of education was abolished by act approved March 19, 1864, Laws of 1864, ch. 52, § 1. It was also provided by the new Constitution, article 9. "§ 12. The board of education shall provide for the education of *all the youths of the State*, through a system of common schools." * * *

By an act of the seventh general assembly, entitled "An act for the public instruction of the State of Iowa," approved March 12, 1858, it was provided that the district board of directors "shall provide for the education of the *colored youths* in separate schools, except in cases where, by the unanimous consent of the persons sending to the school in the sub-district, they may be permitted to attend with the white youths." Laws of 1858, ch. 52, § 30, subdivision 4. This act was, however, declared unconstitutional in December, 1858, by the Supreme Court, because the power to provide a system of education was given by the Constitution to the board of education, and could not be primarily exercised by the general assembly. *The District, etc.*, v. *The City of Dubuque*, 7 Iowa, 262.

Afterward, the board of education passed an act to provide a system of common schools, etc., which was amended by the general assembly and took effect March 1, 1860. By this act it was provided, that "in each sub-district there shall be taught one or more schools for the instruction of *youth* between the ages of five and twenty-one years." * * * No exemption from taxation of the property of colored persons is made by this act. Rev. of 1860, § 2023 *et seq.* By section three of the act,

it is provided, that "*scholars* residing in one district may attend school in another," etc.; and by section thirty-one it is made the duty of the director in each sub-district to make and keep on record a list of the names of *all* heads of families in the sub-district, and the number of *children* in each family between the ages of five and twenty-one years, distinguishing males from females, and to report the same, etc.

By an act to amend and consolidate the school laws approved April 8, 1862, it is provided, that "in each sub-district there shall be taught one or more schools for the instruction of *youth* between the ages of five and twenty-one years." * * * Laws of 1862, ch. 172, § 12. Independent districts are governed by the same laws as district townships. Section 89.

By an amendment of section twelve of the last named act, the amendment being approved April 3, 1866, the same language as to "the instruction of *youth* between the ages of five and twenty-one years," is retained and re-enacted. Laws of 1866, ch. 143, § 3. And it may be remarked, in the conclusion of this summary of legislation, that, since the act of March 12, 1858, there has been no mention of, or discrimination in regard to, color, made.

From the foregoing synopsis of the legislation of the State, it will be seen that there have been three distinct phases of legislative sentiment, or sovereign will, upon the subject under discussion: First, the total exclusion of colored children from our common schools. This dark phase is somewhat illumined by the justice which manifested itself in the exemption of the property of colored persons from taxation for school purposes. Second, the allowance of uncertain, and in practice (owing to the small number of colored children in any school-district) very limited and inferior common school privileges, dependent upon the unanimous consent of the persons

sending to the school. Third, the allowance of equal common school privileges to all.

The rights of this plaintiff must, of course, be measured by, and determined under, the law now in force. That law does not, in terms, deny to the board of school directors the right to exercise their discretion in relation to establishing and maintaining separate schools for colored children. But it does, in effect, deny such discretion. The legislature, in its prior enactments, have denied any discretion to the board of directors, by declaring its sovereign will in relation to the rights of colored children. This declaration of the sovereign will, of course, excluded the exercise of any discretion in relation to the same matter, by the inferior authority — the board of directors. The legislature, by enacting, as it did in 1846 *et seq*, that the common "schools" shall be open and free alike to all *white* children, as effectually excluded colored children, as if it had expressly enacted that they should be excluded — and this, under the rule of construction that *expressio unius exclusio alterius*. Under these laws, it is clear that the board of directors had no discretion intrusted to them to admit colored children into the common schools or to establish separate schools for them.

When the legislature enacted, as it did in 1858, that colored children should be admitted to the common schools only upon the "unanimous consent of the persons sending to the school," and, in case such consent was not given, then the education of colored youth should be provided for in separate schools, all discretion in relation to that matter was effectually denied to the board of school directors. And it would not have been competent for the board of directors, in their discretion, to have admitted colored children to the common schools,

without the unanimous consent of the persons sending to the school.

Now, under our Constitution, which declares that provision shall be made "for the education of *all the youths of the State* through a system of common schools," which constitutional declaration has been effectuated by enactments providing for the "instruction of youth between the ages of five and twenty-one years," without regard to color or nationality, is it not equally clear that all discretion is denied to the board of school directors as to what *youths* shall be admitted? It seems to us that the proposition is too clear to admit of question.

To re-state the whole matter succinctly, it is this: If the legislature have, by first denying admission of colored children to common schools, and then by admitting them only upon unanimous consent, denied all discretion to the school board as to the admission of colored children, such discretion is equally denied when the legislature have declared, pursuant to a constitutional requirement, that *all the youths* of the State shall be admitted to the common schools.

We conclude, therefore, that the law makes no distinction whatever, as to the right of children between the ages of five and twenty-one years, to attend the common schools, and that there is no discretion left with, or given to, the board of school directors, to make any distinction in regard to children within the specified ages.

But there is a claim made in the answer, that the number of children within the independent school-district, of which the defendants are directors, require the establishing and maintaining of several schools therein, and that there are several schools maintained by them to meet the wants of the district. And upon this state of case it is claimed, that the board of directors may exercise a discretion as to which of the several schools any youth therein

shall attend, and that, under this right of discretion, the board of directors were justified in requiring the plaintiff to attend the colored school.

That the board of directors is clothed with certain discretionary powers as to the establishment, maintenance and management of schools within its district cannot be denied.   Doubtless the board may, in its discretion, fix the boundaries within which children must reside, in order to be entitled to admission to a certain school; or may fix the grade of each school, and require certain qualifications, or proficiency in studies, or the like, before any pupil shall be entitled to admission therein.

But this discretion is limited by the line which fixes the *equality of right* in all the youths between the ages of five and twenty-one years.   No discretion which disturbs that equality can be exercised; for the exercise of such a discretion would be a violation of the law, which expressly gives the same rights to *all* the youths.   Therefore, it is not competent for the board of directors to require the children of Irish parents to attend one school, and the children of German parents another; the children of catholic parents to attend one school, and the children of protestant parents another.   And if it should so happen, that there be one or more poorly clad or ragged children in the district, and public sentiment was opposed to the intermingling of such with the well dressed youths of the district, in the same school, it would not be competent for the board of directors, in their discretion, to pander to such false public sentiment, and require the poorly clothed children to attend a separate school.

The term "colored race" is but another designation, and in this country but a synonym for African.   Now, it is very clear, that, if the board of directors are clothed with a discretion to exclude African children from our common schools, and require them to attend (if at all) a

school composed wholly of children of that nationality, they would have the same power and right to exclude German children from our common schools, require them to attend (if at all) a school composed wholly of children of that nationality, and so of Irish, French, English and other nationalities, which together constitute the *American*, and which it is the tendency of our institutions and policy of the government to organize into one harmonious *people*, with a common country and stimulated with the common purpose to perpetuate and spread our free institutions for the development, elevation and happiness of *mankind*.

If the words "colored race" be stricken from the answer and the word "English," "Irish," or "German," inserted in their place, it would present precisely the same *principle* for our determination as is now presented. It would only apply to a different race. Our statute does not, either in letter or in spirit, recognize or justify any such distinction or limitations of right or privilege on account of nationality. For the courts to sustain a board of school directors or other subordinate board or officer in limiting the rights and privileges of persons by reason of their nationality, would be to sanction a plain violation of the spirit of our laws not only, but would tend to perpetuate the national differences of our people and stimulate a constant strife, if not a war of races.

Our statute has expressed the sovereign will, that all the youths of the State between the ages of five and twenty-one years shall be entitled to the privileges and benefits of our common schools, and it is not competent for the board of directors to resist that sovereign will and declare, that, since "public sentiment in their district is opposed to the intermingling of the white and colored children in the same school," they will deny equal privileges to some of the youths.

In other words, all the youths are equal before the law, and there is no discretion vested in the board of directors or elsewhere, to interfere with or disturb that equality. The board of directors may exercise a uniform discretion equally operative upon all, as to the residence, or qualifications, or freedom from contagious disease, or the like, of children, to entitle them to admission to each particular school; but the board cannot, in their discretion, or otherwise, deny a youth admission to any particular school because of his or her nationality, religion, color, clothing or the like.

Therefore, since it appears that the plaintiff is of the proper age, resides within the boundary and possesses the qualifications requisite for admission to Grammar School No. 2, " and has " (as stated in her petition), in no wise forfeited her right " to admission there, it follows, that the defendants wrongfully refused her admission. It was the clear legal duty of the board of directors, resulting from their said office, to admit the plaintiff to said school, and to equal privileges with the other pupils therein. The District Court did not err in making the mandamus peremptory.

Affirmed.

WRIGHT, J., *dissenting.* — The language of the statute, that, when a discretion is left to an inferior tribunal, the writ of mandamus can only compel it to act, and that it cannot control this discretion (Rev. § 2763), is but the recognition of the rule as it stood at common law. The duty to be performed must be imperative, not discretionary. *Rex* v. *Hughes*, 3 A. & E. 429; *Same* v. *Commissioner*, 4 id. 297; Tapping on Mand. 13 and 14, and cases cited; *United States* v. *Dubuque Co.*, Mor. 31; *Chance* v. *Temple*, 4 Iowa, 179. So, also, the same cases teach, that the writ will not issue when the discretion has been

exercised, and no ground appears that it has been done wrongfully. Nor will it, when the discretion has been exercised in accordance with reasonable rules and practice. *Rex* v. *Flocknold Inclosure*, 2 Chitty, 251; *Rex* v. *Lancashire*, 7 B. & C. 691; Tapping on Mand. 14.

In this case it fairly appears from the answer, that the child Susan resided with her father in the particular subdivision of the district which entitled her to attend this grammar school, and that the directors determined that she should attend the colored school, outside this subdivision. I also gather from the answer, that, at the time she applied to be admitted to this school, there was no grammar department organized in the school to which they determined to send her, but that they proposed, before suit brought, to create the same for the instruction of this scholar, and to put in charge thereof a competent teacher.

Now, if the foregoing opinion had placed the affirmance of the case upon the ground that it was the right of the scholar, if she, or her parent for her, so elected, to attend the school provided for scholars in the subdivision *where she resided*, and that it was the duty of the board to admit her to the same, I should have been content. So too, I should have no hesitation in holding, that, if the scholar was so far advanced that she could not receive proper instruction in the colored school, and such instruction was not furnished her there, she could demand admission to the school from which she was excluded. And I incline to the belief that the duty to thus admit could not be excused or avoided by a mere offer to organize the department, as stated in the answer. If it was not organized, she, at least, had a right to instruction in the other school, until there was an actual present ability to instruct in the other. For the performance of a duty cannot be avoided, by a mere offer to do

something which may or may not be performed, where, pending such proposed performance, the rights of the petitioner are absolute.

Upon either of these grounds, I repeat, I could have concurred in the opinion affirming this judgment. And having said this much, I have only to add, that, while the Constitution provides for the education *of all the youths of the State*, by a system of common schools, and while, without regard to color, the legislature has provided, in obedience to the Constitution, for this instruction, I am not prepared to admit that the school directors have no discretion in arranging the schools, nor that they cannot direct where the children shall attend school, provided, of course, they are kept within their proper districts, and have furnished to them the necessary and proper instruction. I concede that the law makes no distinction as to the rights of children between the ages of five and twenty-one. All have a right to attend the common schools. And this is what the Constitution intended to secure. This right, the directors in this case recognized. The rule adopted by them was reasonable, and I cannot admit that the refusal to admit this scholar into this particular school was so wrongful as that the courts should interfere by mandamus. If she was allowed to attend a school in the proper district, having the suitable instruction furnished to others, then I know of no principle upon which she can complain. It is not for the child nor the parent to control in these matters, but, in my opinion, the very integrity of our deservedly popular school system depends upon leaving such questions to the board.

There is no absolute legal right in a colored child to attend a white school rather than one made up of children of African descent; just as there is no such right in a white child to attend a colored school. The school offi-

cers, in my opinion, are the appropriate judges in these matters. And, when they, to the extent of the means at their command, furnish to all alike the instruction contemplated by the Constitution and law, I would not compel them to admit the scholars into one rather than another school of the district.

If, in their opinion, the best interests of the schools require that particular families should be kept together, or should be separated; if they believe that scholars will more rapidly advance, and the harmony and welfare of the schools be promoted by having this child under this instruction, and that one under another; if, because of the actual condition of public sentiment for the time being, they deem it more advisable, and, in the exercise of a sound discretion, direct that colored children shall be taught by themselves; or, on the other hand, should direct that all should attend the same school,—I do not believe the courts should interfere. If this rule excludes the child from the benefit of the common schools within his or her district, just as fully, just as completely as all others, then there would be a violation of an imperative duty. The matter would no longer rest in discretion, and the writ might issue. As I understand the record, so far as relates to the point now under consideration, and the one for the most part made by counsel, and that which they desired should be decided, I do not believe there was such a failure to perform an imperative legal duty by the board, as to justify our interference. The principle of equal rights to all does not demand that all the children of the district should be taught in the same building, nor by the same teacher; nor that a colored child shall be transferred from one school to another, nor that this should be done for a white child. The true inquiry is: Have all equal school privileges? And, if so, being all children alike, and alike equal before the law, but no

more, this equality is preserved by adopting the same rule as to all. This equality was in no sense disturbed, under the rule adopted by this board. So holding, I cannot concur in affirming the judgment below upon the point ruled in the foregoing opinion.