Justice THOMAS, concurring.
 

 I join the Court's opinion because I agree that the Court of Appeals did not apply strict scrutiny to the University of Texas at Austin's (University) use of racial discrimination in admissions decisions.
 
 Ante,
 
 at 2415. I write separately to explain that I would overrule
 
 Grutter v. Bollinger,
 

 539 U.S. 306
 
 ,
 
 123 S.Ct. 2325
 
 ,
 
 156 L.Ed.2d 304
 
 (2003), and hold that a State's use of race in higher education admissions decisions is categorically prohibited by the Equal Protection Clause.
 

 I
 

 A
 

 The Fourteenth Amendment provides that no State shall "deny to any person ... the equal protection of the laws."
 

 The Equal Protection Clause guarantees every person the right to be treated equally by the State, without regard to race. "At the heart of this [guarantee] lies the principle that the government must treat citizens as individuals, and not as members of racial, ethnic, or religious groups."
 
 Missouri v. Jenkins,
 

 515 U.S. 70
 
 , 120-121,
 
 115 S.Ct. 2038
 
 ,
 
 132 L.Ed.2d 63
 
 (1995) (THOMAS, J., concurring). "It is for this reason that we must subject all racial classifications to the strictest of scrutiny."
 

 Id.,
 

 at 121
 
 ,
 
 115 S.Ct. 2038
 
 .
 

 Under strict scrutiny, all racial classifications are categorically prohibited unless they are " 'necessary to further a compelling governmental interest' " and "narrowly tailored to that end."
 
 Johnson v. California,
 

 543 U.S. 499
 
 , 514,
 
 125 S.Ct. 1141
 
 ,
 
 160 L.Ed.2d 949
 
 (2005) (quoting
 
 Grutter,
 
 supra,
 

 at 327
 
 ,
 
 123 S.Ct. 2325
 
 ). This most exacting standard "has proven automatically fatal" in almost every case.
 
 Jenkins,
 
 supra,
 

 at 121
 
 ,
 
 115 S.Ct. 2038
 
 (THOMAS, J., concurring). And rightly so. "Purchased at the price of immeasurable human suffering, the equal protection principle reflects our Nation's understanding that [racial] classifications ultimately have a destructive impact on the individual and our society."
 
 Adarand Constructors, Inc. v. Penã,
 

 515 U.S. 200
 
 , 240,
 
 115 S.Ct. 2097
 
 ,
 
 132 L.Ed.2d 158
 
 (1995) (THOMAS, J., concurring in part and concurring in judgment). "The Constitution abhors classifications based on race" because "every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all."
 
 Grutter,
 
 supra,
 

 at 353
 
 ,
 
 123 S.Ct. 2325
 
 (THOMAS, J., concurring in part and dissenting in part).
 

 B
 

 1
 

 The Court first articulated the strict-scrutiny standard in
 
 Korematsu v. United
 

 States,
 

 323 U.S. 214
 
 ,
 
 65 S.Ct. 193
 
 ,
 
 89 L.Ed. 194
 
 (1944). There, we held that "[p]ressing public necessity may sometimes justify the existence of [racial discrimination]; racial antagonism never can."
 

 Id.,
 

 at 216
 
 ,
 
 65 S.Ct. 193
 
 .
 
 [1]
 
 Aside from
 
 Grutter,
 
 the Court has
 recognized only two instances in which a "[p]ressing public necessity" may justify racial discrimination by the government. First, in
 
 Korematsu,
 
 the Court recognized that protecting national security may satisfy this exacting standard. In that case, the Court upheld an evacuation order directed at "all persons of Japanese ancestry" on the grounds that the Nation was at war with Japan and that the order had "a definite and close relationship to the prevention of espionage and sabotage."
 
 323 U.S., at 217-218
 
 ,
 
 65 S.Ct. 193
 
 . Second, the Court has recognized that the government has a compelling interest in remedying past discrimination for which it is responsible, but we have stressed that a government wishing to use race must provide "a 'strong basis in evidence for its conclusion that remedial action [is] necessary.' "
 
 Richmond v. J.A. Croson Co.,
 

 488 U.S. 469
 
 , 500, 504,
 
 109 S.Ct. 706
 
 ,
 
 102 L.Ed.2d 854
 
 (1989) (quoting
 
 Wygant v. Jackson Bd. of Ed.,
 

 476 U.S. 267
 
 , 277,
 
 106 S.Ct. 1842
 
 ,
 
 90 L.Ed.2d 260
 
 (1986) (plurality opinion)).
 

 In contrast to these compelling interests that may, in a narrow set of circumstances, justify racial discrimination, the Court has frequently found other asserted interests insufficient. For example, in
 
 Palmore v. Sidoti,
 

 466 U.S. 429
 
 ,
 
 104 S.Ct. 1879
 
 ,
 
 80 L.Ed.2d 421
 
 (1984), the Court flatly rejected a claim that the best interests of a child justified the government's racial discrimination. In that case, a state court awarded custody to a child's father because the mother was in a mixed-race marriage. The state court believed the child might be stigmatized by living in a mixed-race household and sought to avoid this perceived problem in its custody determination. We acknowledged the possibility of stigma but nevertheless concluded that "the reality of private biases and the possible injury they might inflict" do not justify racial discrimination.
 

 Id.,
 

 at 433
 
 ,
 
 104 S.Ct. 1879
 
 . As we explained, "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."
 

 Ibid.
 

 Two years later, in
 
 Wygant,
 

 supra,
 

 the Court held that even asserted interests in remedying societal discrimination and in providing role models for minority students could not justify governmentally imposed racial discrimination. In that case, a collective-bargaining agreement between a school board and a teacher's union favored teachers who were " 'Black, American Indian, Oriental, or of Spanish descendancy.' "
 

 Id.,
 

 at 270-271
 
 , and n. 2,
 
 106 S.Ct. 1842
 
 (plurality opinion). We rejected the interest in remedying societal discrimination because it had no logical stopping point.
 

 Id.,
 

 at 276
 
 ,
 
 106 S.Ct. 1842
 
 . We similarly rebuffed as inadequate the interest in providing role models to minority students and added that the notion that "black students are better off with black teachers could lead to the very system the Court rejected in
 
 Brown v. Board of Education,
 

 347 U.S. 483
 
 ,
 
 74 S.Ct. 686
 
 ,
 
 98 L.Ed. 873
 
 (1954)."
 

 Ibid.
 

 2
 

 Grutter
 
 was a radical departure from our strict-scrutiny precedents. In
 
 Grutter,
 
 the University of Michigan Law School (Law School) claimed that it had a compelling reason to discriminate based on race.
 

 The reason it advanced did not concern protecting national security or remedying its own past discrimination. Instead, the Law School argued that it needed to discriminate in admissions decisions in order to obtain the "educational benefits that flow from a diverse student body." 539 U.S., at 317,
 
 123 S.Ct. 2325
 
 . Contrary to the very meaning of strict scrutiny, the Court
 
 deferred
 
 to the Law School's determination that this interest was sufficiently compelling to justify racial discrimination.
 

 Id.,
 

 at 325
 
 ,
 
 123 S.Ct. 2325
 
 .
 

 I dissented from that part of the Court's decision. I explained that "only those measures the State must take to provide a bulwark against anarchy, or to prevent violence, will constitute a 'pressing public necessity' " sufficient to satisfy strict scrutiny.
 
 Id
 
 ., at 353,
 
 123 S.Ct. 2325
 
 . Cf.
 
 Lee v. Washington,
 

 390 U.S. 333
 
 , 334,
 
 88 S.Ct. 994
 
 ,
 
 19 L.Ed.2d 1212
 
 (1968) (Black, J., concurring) (protecting prisoners
 from violence might justify narrowly tailored discrimination);
 
 J.A. Croson,
 
 supra,
 

 at 521
 
 ,
 
 109 S.Ct. 706
 
 (SCALIA, J., concurring in judgment) ("At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb ... can justify [racial discrimination]"). I adhere to that view today. As should be obvious, there is nothing "pressing" or "necessary
 
 "
 
 about obtaining whatever educational benefits may flow from racial diversity.
 

 II
 

 A
 

 The University claims that the District Court found that it has a compelling interest in attaining "a diverse student body and the educational benefits flowing from such diversity." Brief for Respondents 18. The use of the conjunction, "and," implies that the University believes its discrimination furthers two distinct interests. The first is an interest in attaining diversity for its own sake. The second is an interest in attaining educational benefits that allegedly flow from diversity.
 

 Attaining diversity for its own sake is a nonstarter. As even
 
 Grutter
 
 recognized, the pursuit of diversity as an end is nothing more than impermissible "racial balancing." 539 U.S., at 329-330,
 
 123 S.Ct. 2325
 
 ("The Law School's interest is not simply 'to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin.' That would amount to outright racial balancing, which is patently unconstitutional" (quoting
 
 Regents of Univ. of Cal. v. Bakke,
 

 438 U.S. 265
 
 , 307,
 
 98 S.Ct. 2733
 
 ,
 
 57 L.Ed.2d 750
 
 (1978) ; citation omitted)); see also
 
 id
 
 ., at 307,
 
 98 S.Ct. 2733
 
 ("Preferring members of any one group for no reason other than race or ethnic origin is discrimination for its own sake. This the Constitution forbids"). Rather, diversity can only be the
 
 means
 
 by which the University obtains educational benefits; it cannot be an end pursued for its own sake. Therefore, the
 
 educational benefits
 
 allegedly produced by diversity must rise to
 the level of a compelling state interest in order for the program to survive strict scrutiny.
 

 Unfortunately for the University, the educational benefits flowing from student body diversity-assuming they exist-hardly qualify as a compelling state interest. Indeed, the argument that educational benefits justify racial discrimination was advanced in support of racial segregation in the 1950's, but emphatically rejected by this Court. And just as the alleged educational benefits of segregation were insufficient to justify racial discrimination then, see
 
 Brown v. Board of Education,
 

 347 U.S. 483
 
 ,
 
 74 S.Ct. 686
 
 ,
 
 98 L.Ed. 873
 
 (1954), the alleged educational benefits of diversity
 cannot justify racial discrimination today.
 

 1
 

 Our desegregation cases establish that the Constitution prohibits public schools from discriminating based on race, even if discrimination is necessary to the schools' survival. In
 
 Davis v. School Bd. of Prince Edward Cty.,
 
 decided with
 
 Brown, supra,
 
 the school board argued that if the Court found segregation unconstitutional, white students would migrate to private schools, funding for public schools would decrease, and public schools would either decline in quality or cease to exist altogether. Brief for Appellees in
 
 Davis v. School Bd
 
 .
 
 of Prince Edward Cty
 
 ., O.T. 1952, No. 191, p. 30 (hereinafter Brief for Appellees in
 
 Davis
 
 ) ("Virginians ... would no longer permit sizeable appropriations for schools on either the State or local level; private segregated schools would be greatly increased in number and the masses of our people, both white and Negro, would suffer terribly.... [M]any white parents would withdraw their children from the public schools and, as a result, the program of providing better schools would be abandoned" (internal quotation marks omitted)). The true victims of desegregation, the school board asserted, would be black students, who would be unable to afford private school. See
 
 id.,
 
 at 31 ("[W]ith the demise of segregation, education in Virginia would receive
 a serious setback. Those who would suffer most would be the Negroes who, by and large, would be economically less able to afford the private school"); Tr. of Oral Arg. in
 
 Davis v. School Bd. of Prince Edward Cty.,
 
 O.T. 1954, No. 3, p. 208 ("What is worst of all, in our opinion, you impair the public school system of Virginia and the victims will be the children of both races, we think the Negro race worse than the white race, because the Negro race needs it more by virtue of these disadvantages under which they have labored. We are up against the proposition: What does the Negro profit if he procures an immediate detailed decree from this Court now and then impairs or mars or destroys the public school system in Prince Edward County").
 
 [2]
 

 Unmoved by this sky-is-falling argument, we held that segregation violates the principle of equality enshrined in the Fourteenth Amendment. See
 
 Brown, supra,
 
 at 495,
 
 74 S.Ct. 686
 
 ("[I]n the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal"); see also
 
 Allen v. School Bd. of Prince
 

 Edward Cty.,
 

 249 F.2d 462
 
 , 465 (C.A.4 1957) (
 
 per curiam
 
 ) ("The fact that the schools might be closed if the order were enforced is no reason for not enforcing it. A person may not be denied enforcement of rights to
 which he is entitled under the Constitution of the United States because of action taken or threatened in defiance of such rights"). Within a matter of years, the warning became reality: After being ordered to desegregate, Prince Edward County closed its public schools from the summer of 1959 until the fall of 1964. See R. Sarratt, The Ordeal of Desegregation 237 (1966). Despite this fact, the Court never backed down from its rigid enforcement of the Equal Protection Clause's antidiscrimination principle.
 

 In this case, of course, Texas has not alleged that the University will close if it is prohibited from discriminating based on race. But even if it had, the foregoing cases make clear that even that consequence would not justify its use of racial discrimination. It follows,
 
 a fortiori,
 
 that the putative educational benefits of student body diversity cannot justify racial discrimination: If a State does not have a compelling interest in the
 
 existence
 
 of a university, it certainly cannot have a compelling interest in the supposed benefits that might accrue to that university from racial discrimination. See
 
 Grutter,
 

 539 U.S., at 361
 
 ,
 
 123 S.Ct. 2325
 
 (opinion of THOMAS, J.) ("[A] marginal improvement in legal education cannot justify racial discrimination where the Law School has no compelling interest either in its existence or in its current educational and admissions policies"). If the Court were actually applying strict scrutiny, it would require Texas either to close the University or to stop discriminating against applicants based on their race. The Court has put other schools to that choice, and there is no reason to treat the University differently.
 

 2
 

 It is also noteworthy that, in our desegregation cases, we rejected arguments that are virtually identical to those advanced
 by the University today. The University asserts, for instance, that the diversity obtained through its discriminatory admissions program prepares its students to become leaders in a diverse society. See,
 
 e.g.,
 
 Brief for Respondents 6 (arguing that student body diversity "prepares students to become the next generation of leaders in an increasingly diverse society"). The segregationists likewise defended segregation on the ground that it provided more leadership opportunities for blacks. See,
 
 e.g.,
 
 Brief for Respondents in
 
 Sweatt
 
 96 ("[A] very large group of Northern Negroes [comes] South to attend separate colleges, suggesting that the Negro does not secure as well-rounded a college life at a mixed college, and that the separate college offers him positive advantages; that there is a more normal social life for the Negro in a separate college; that there is a greater opportunity for full participation and for the development of leadership; that the Negro is inwardly more 'secure' at a college of his own people"); Brief for Appellees in
 
 Davis
 
 25-26 ("The Negro child gets an opportunity to participate in segregated schools that I have never seen accorded to him in non-segregated schools. He is important, he holds offices, he is accepted by his fellows, he is on athletic teams, he has a full place there" (internal quotation marks omitted)). This argument was unavailing. It is irrelevant under the Fourteenth Amendment whether segregated or mixed schools produce better leaders. Indeed, no court today would accept the suggestion that segregation is permissible because historically black colleges produced Booker T. Washington, Thurgood Marshall, Martin Luther King, Jr., and other prominent leaders. Likewise, the University's racial discrimination cannot be justified on the ground that it will produce better leaders.
 The University also asserts that student body diversity improves interracial relations. See,
 
 e.g.,
 
 Brief for Respondents 6 (arguing that student body diversity promotes "cross-racial understanding" and breaks down racial and ethnic
 stereotypes). In this argument, too, the University repeats arguments once marshaled in support of segregation. See,
 
 e.g.,
 
 Brief for Appellees in
 
 Davis
 
 17 ("Virginia has established segregation in certain fields as a part of her public policy to prevent violence and reduce resentment. The result, in the view of an overwhelming Virginia majority, has been to improve the relationship between the different races");
 
 id.,
 
 at 25 ("If segregation be stricken down, the general welfare will be definitely harmed ... there would be more friction developed" (internal quotation marks omitted)); Brief for Respondents in
 
 Sweatt
 
 93 ("Texas has had no serious breaches of the peace in recent years in connection with its schools. The separation of the races has kept the conflicts at a minimum");
 
 id.,
 
 at 97-98 ("The legislative acts are based not only on the belief that it is the best way to provide education for both races, and the knowledge that separate schools are necessary to keep public support for the public schools, but upon the necessity to maintain the public peace, harmony, and welfare"); Brief for Appellees in
 
 Briggs
 
 32 ("The southern Negro, by and large, does not want an end to segregation in itself any more than does the southern white man. The Negro in the South knows that discriminations, and worse, can and would multiply in such event" (internal quotation marks omitted)). We flatly rejected this line of arguments in
 
 McLaurin v. Oklahoma State Regents for Higher Ed.,
 

 339 U.S. 637
 
 ,
 
 70 S.Ct. 851
 
 ,
 
 94 L.Ed. 1149
 
 (1950), where we held that segregation would be unconstitutional even if white students never tolerated blacks.
 
 Id.,
 
 at 641,
 
 70 S.Ct. 851
 
 ("It may be argued that appellant will be in no better position when these restrictions are removed, for he may still be set apart by his fellow students. This we think irrelevant. There is a vast difference-a Constitutional difference-between restrictions imposed by the state which prohibit the intellectual commingling of students, and the refusal of individuals to commingle where the state presents no such bar"). It is,
 thus, entirely irrelevant whether the University's racial discrimination increases or decreases tolerance.
 

 Finally, while the University admits that racial discrimination in admissions is not ideal, it asserts that it is a temporary necessity because of the enduring race consciousness of our society. See Brief for Respondents 53-54 ("Certainly all aspire for a colorblind society in which race does not matter.... But in Texas, as in America, 'our highest aspirations are yet unfulfilled' "). Yet again, the University echoes the hollow justifications advanced by the segregationists. See,
 
 e.g.,
 
 Brief for State of Kansas on Reargument in
 
 Brown v. Board of Education,
 
 O.T. 1953, No. 1, p. 56 ("We grant that segregation may not be the ethical or political ideal. At the same time we recognize that practical considerations may prevent realization of the ideal"); Brief for Respondents in
 
 Sweatt
 
 94 ("The racial consciousness and feeling which exists today in the minds of many people may be regrettable and unjustified. Yet they are a reality which must be dealt with by the State if it is to preserve harmony and peace and at the same time furnish equal education to both groups");
 
 id.,
 
 at 96 (" '[T]he
 
 mores
 
 of racial relationships are such as to rule out, for the present at least, any possibility of admitting white persons and Negroes to the same institutions' "); Brief for Appellees in
 
 Briggs
 
 26-27 ("[I]t would be unwise in administrative practice ... to mix the two races in the same schools at the present
 time and under present conditions"); Brief for Appellees on Reargument in
 
 Briggs v. Elliott,
 
 O.T. 1953, No. 2, p. 79 ("It is not 'racism' to be cognizant of the fact that mankind has struggled with race problems and racial tensions for upwards of sixty centuries"). But these arguments too were unavailing. The Fourteenth Amendment views racial bigotry as an evil to be stamped out, not as an excuse for perpetual racial tinkering by the State. See
 
 DeFunis v. Odegaard,
 

 416 U.S. 312
 
 , 342,
 
 94 S.Ct. 1704
 
 ,
 
 40 L.Ed.2d 164
 
 (1974) (Douglas, J., dissenting) ("The Equal Protection Clause commands
 the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized"). The University's arguments to this effect are similarly insufficient to justify discrimination.
 
 [3]
 

 3
 

 The University's arguments today are no more persuasive than they were 60 years ago. Nevertheless, despite rejecting identical arguments in
 
 Brown,
 
 the Court in
 
 Grutter
 
 deferred to the University's determination that the diversity obtained by racial discrimination would yield educational benefits. There is no principled distinction between the University's assertion that diversity yields educational benefits and the segregationists' assertion that segregation yielded those same benefits. See
 
 Grutter,
 

 539 U.S., at 365-366
 
 ,
 
 123 S.Ct. 2325
 
 (opinion of THOMAS, J.) ("Contained within today's majority opinion is the seed of a new constitutional justification for a concept I thought long and rightly rejected-racial segregation"). Educational benefits are a far cry from the truly compelling state interests that we previously required to justify use of racial classifications.
 

 B
 

 My view of the Constitution is the one advanced by the plaintiffs in
 
 Brown
 
 : "[N]o State has any authority under the
 equal-protection clause of the Fourteenth Amendment to use race as a factor in affording educational opportunities among its citizens." Tr. of Oral Arg. in
 
 Brown v. Board of Education,
 
 O.T. 1952, No. 8, p. 7; see also Juris. Statement in
 
 Davis v. School Bd. of Prince Edward Cty.,
 
 O.T. 1952, No. 191, p. 8 ("[W]e take the unqualified position that the Fourteenth Amendment has totally stripped the state of power to make race and color the basis for governmental action"); Brief for Appellants in
 
 Brown v. Board of Education,
 
 O.T. 1952, No. 8, p. 5 ("The Fourteenth Amendment precludes a state from imposing distinctions or classifications based upon race and color alone"); Brief for Appellants in Nos. 1, 2, and 4, and for Respondents in No. 10 on Reargument in
 
 Brown v. Board of Education,
 
 O.T. 1953, p. 65 ("That the Constitution is color blind is our dedicated belief"). The Constitution does not pander to faddish theories about whether race mixing is in the public interest. The Equal Protection Clause strips States of all authority to use race as a factor in providing education. All applicants
 must be treated equally under the law, and no benefit in the eye of the beholder can justify racial discrimination.
 

 This principle is neither new nor difficult to understand. In 1868, decades before
 
 Plessy
 
 , the Iowa Supreme Court held that schools may not discriminate against applicants based on their skin color. In
 
 Clark v. Board of Directors,
 

 24 Iowa 266
 
 (1868), a school denied admission to a student because she was black, and "public sentiment [was] opposed to the intermingling of white and colored children in the same schools."
 

 Id.,
 

 at 269
 
 . The Iowa Supreme Court rejected that flimsy justification, holding that "all the youths are equal before the law, and there is no discretion vested in the board ... or elsewhere, to interfere with or disturb that equality."
 

 Id.,
 

 at 277
 
 ."For the courts to sustain a board of school directors ... in limiting the rights and privileges of persons by reason of their [race], would be to sanction a plain violation of the spirit of
 our laws not only, but would tend to perpetuate the national differences of our people and stimulate a constant strife, if not a war of races."
 

 Id.,
 

 at 276
 
 . This simple, yet fundamental, truth was lost on the Court in
 
 Plessy
 
 and
 
 Grutter
 
 .
 

 I would overrule
 
 Grutter
 
 and hold that the University's admissions program violates the Equal Protection Clause because the University has not put forward a compelling interest that could possibly justify racial discrimination.
 

 III
 

 While I find the theory advanced by the University to justify racial discrimination facially inadequate, I also believe that its use of race has little to do with the alleged educational benefits of diversity. I suspect that the University's program is instead based on the benighted notion that it is possible to tell when discrimination helps, rather than hurts, racial minorities. See
 
 post,
 
 at 2433 - 2434 (GINSBURG, J., dissenting) ("[G]overnment actors, including state universities, need not be blind to the lingering effects of 'an overtly discriminatory past,' the legacy of 'centuries of law-sanctioned inequality' "). But "[h]istory should teach greater humility."
 
 Metro Broadcasting, Inc. v. FCC,
 

 497 U.S. 547
 
 , 609,
 
 110 S.Ct. 2997
 
 ,
 
 111 L.Ed.2d 445
 
 (1990) (O'Connor, J., dissenting). The worst forms of racial discrimination in this Nation have always been accompanied by straight-faced representations that discrimination helped minorities.
 

 A
 

 Slaveholders argued that slavery was a "positive good" that civilized blacks and elevated them in every dimension of life. See,
 
 e.g.,
 
 Calhoun, Speech in the U.S. Senate, 1837, in P. Finkelman, Defending Slavery 54, 58-59 (2003) ( "Never before has the black race of Central Africa, from the dawn of history to the present day, attained a condition so civilized and so improved, not only physically, but morally and intellectually.... [T]he relation now existing in the slaveholding States between the two [races], is, instead of an evil, a good-
 a positive good"); Harper, Memoir on Slavery, in The Ideology of Slavery 78, 115-116 (D. Faust ed. 1981) ("Slavery, as it is said in an eloquent article published in a Southern periodical work ... 'has done more to elevate a degraded race in the scale of humanity; to tame the savage; to civilize the barbarous; to soften the ferocious; to enlighten the ignorant, and to spread the blessings of [C]hristianity among the heathen, than all the missionaries that philanthropy and religion have ever sent forth' "); Hammond, The Mudsill Speech, 1858, in Defending Slavery,
 
 supra,
 
 at 80, 87 ("They are elevated from the
 condition in which God first created them, by being made our slaves").
 

 A century later, segregationists similarly asserted that segregation was not only benign, but good for black students. They argued, for example, that separate schools protected black children from racist white students and teachers. See,
 
 e.g.,
 
 Brief for Appellees in
 
 Briggs
 
 33-34 (" 'I have repeatedly seen wise and loving colored parents take infinite pains to force their little children into schools where the white children, white teachers, and white parents despised and resented the dark child, made mock of it, neglected or bullied it, and literally rendered its life a living hell. Such parents want their child to "fight" this thing out,-but, dear God, at what a cost! ... We shall get a finer, better balance of spirit; an infinitely more capable and rounded personality by putting children in schools where they are wanted, and where they are happy and inspired, than in thrusting them into hells where they are ridiculed and hated' " (quoting DuBois, Does the Negro Need Separate Schools? 4 J. of Negro Educ. 328, 330-331 (1935))); Tr. of Oral Arg. in
 
 Bolling v. Sharpe,
 
 O.T. 1952, No. 413, p. 56 ("There was behind these [a]cts a kindly feeling [and] an intention to help these people who had been in bondage. And there was and there still is an intention by the Congress to see that these children shall be educated in a healthful atmosphere, in a wholesome atmosphere, in a place where they are wanted, in a place where
 they will not be looked upon with hostility, in a place where there will be a receptive atmosphere for learning for both races without the hostility that undoubtedly Congress thought might creep into these situations"). And they even appealed to the fact that many blacks agreed that separate schools were in the "best interests" of both races. See,
 
 e.g.,
 
 Brief for Appellees in
 
 Davis
 
 24-25 (" 'It has been my experience, in working with the people of Virginia, including both white and Negro, that the customs and the habits and the traditions of Virginia citizens are such that they believe for the best interests of both the white and the Negro that the separate school is best' ").
 

 Following in these inauspicious footsteps, the University would have us believe that its discrimination is likewise benign. I think the lesson of history is clear enough: Racial discrimination is never benign. " '[B]enign' carries with it no independent meaning, but reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable." See
 
 Metro Broadcasting,
 

 497 U.S., at 610
 
 ,
 
 110 S.Ct. 2997
 
 (O'Connor, J., dissenting). It is for this reason that the Court has repeatedly held that strict scrutiny applies to
 
 all
 
 racial classifications, regardless of whether the government has benevolent motives. See,
 
 e.g.,
 

 Johnson,
 

 543 U.S., at 505
 
 ,
 
 125 S.Ct. 1141
 
 ("We have insisted on strict scrutiny in every context, even for so-called 'benign' racial classifications");
 
 Adarand,
 
 515 U.S., at 227,
 
 115 S.Ct. 2097
 
 ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny");
 
 J.A. Croson,
 

 488 U.S., at 500
 
 ,
 
 109 S.Ct. 706
 
 ("Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice"). The University's professed good intentions cannot excuse its outright racial discrimination any more than such intentions justified the now denounced arguments of slaveholders and segregationists.
 

 B
 

 While it does not, for constitutional purposes, matter whether the University's racial discrimination is benign, I note that
 racial engineering does in fact have insidious consequences. There can be no doubt that the University's discrimination injures white and Asian applicants who are denied admission because of their race. But I believe the injury to those admitted under the University's discriminatory admissions program is even more harmful.
 

 Blacks and Hispanics admitted to the University as a result of racial discrimination are, on average, far less prepared than their white and Asian classmates. In the University's entering class of 2009, for example, among the students admitted outside the Top Ten Percent plan, blacks scored at the 52d percentile of 2009 SAT takers nationwide, while Asians scored at the 93d percentile. Brief for Richard Sander et al. as
 
 Amici Curiae
 
 3-4, and n. 4. Blacks had a mean GPA of 2.57 and a mean SAT score of 1524; Hispanics had a mean GPA of 2.83 and a mean SAT score of 1794; whites had a mean GPA of 3.04 and a mean SAT score of 1914; and Asians had a mean GPA of 3.07 and a mean SAT score of 1991.
 
 [4]
 

 Ibid.
 

 Tellingly, neither the University nor any of the 73
 
 amici
 
 briefs in support of racial discrimination has presented a shred of evidence that black and Hispanic students are able to close this substantial gap during their time at the University. Cf. Thernstrom & Thernstrom, Reflections on the Shape of the River,
 
 46 UCLA L.Rev. 1583
 
 , 1605-1608 (1999) (discussing the failure of defenders of racial discrimination in admissions to consider the fact that its "beneficiaries" are underperforming in the classroom). "It is a fact that in virtually all selective schools ... where racial preferences in
 admission is practiced, the majority of [black] students end up in the lower quarter of their class." S. Cole & E. Barber, Increasing Faculty Diversity: The Occupational Choices of High-Achieving Minority Students 124 (2003). There is no reason to believe this is not the case at the University. The University and its dozens of
 
 amici
 
 are deafeningly silent on this point.
 

 Furthermore, the University's discrimination does nothing to increase the number of blacks and Hispanics who have access to a college education generally. Instead, the University's discrimination has a pervasive shifting effect. See T. Sowell, Affirmative Action Around the World 145-146 (2004). The University admits minorities who otherwise would have attended less selective colleges where they would have been more evenly matched. But, as a result of the mismatching, many blacks and Hispanics who likely would have excelled at less elite schools are placed in a position where underperformance is all but inevitable because they are less academically prepared than the white and Asian students with whom they must compete. Setting aside the damage wreaked upon the self-confidence of these overmatched students, there is no evidence that they learn more at the University than they would have learned at other schools for which they were better prepared. Indeed, they may learn less.
 

 The Court of Appeals believed that the University needed to enroll more blacks and Hispanics because they remained "clustered in certain programs."
 
 631 F.3d 213
 
 , 240 (C.A.5 2011) ("[N]early a quarter of the undergraduate students in [the University's] College of Social Work are Hispanic, and more than 10% are [black]. In the College of Education, 22.4% of students are Hispanic and 10.1% are [black]"). But racial discrimination may be the cause of, not the solution to, this clustering. There is some evidence that students admitted
 as a result of racial discrimination are more likely to abandon their initial aspirations to become scientists and engineers than are students with similar qualifications who
 attend less selective schools. See,
 
 e.g.,
 
 Elliott, Strenta, Adair, Matier, & Scott, The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions, 37 Research in Higher Educ. 681, 699-701 (1996).
 
 [5]
 
 These students may well drift towards less competitive majors because the mismatch caused by racial discrimination in admissions makes it difficult for them to compete in more rigorous majors.
 

 Moreover, the University's discrimination "stamp[s] [blacks and Hispanics] with a badge of inferiority."
 
 Adarand,
 
 515 U.S., at 241,
 
 115 S.Ct. 2097
 
 (opinion of THOMAS, J.). It taints the accomplishments of all those who are admitted as a result of racial discrimination. Cf. J. McWhorter, Losing the Race: Self-Sabotage in Black America 248 (2000) ("I was never able to be as proud of getting into Stanford as my classmates could be.... [H]ow much of an achievement can I truly say it was to have been a good enough
 
 black
 
 person to be admitted, while my colleagues had been considered good enough
 
 people
 
 to be admitted"). And, it taints the accomplishments of all those who are the same race as those admitted as a result of racial discrimination. In this case, for example, most blacks and Hispanics attending the University were admitted without discrimination under the Top Ten Percent plan, but no one can distinguish those students from the ones whose race played a role in their admission.
 

 "When blacks [and Hispanics] take positions in the highest places of government, industry, or academia, it is an open question ... whether their skin color played a part in their advancement." See
 
 Grutter,
 

 539 U.S., at 373
 
 ,
 
 123 S.Ct. 2325
 
 (opinion of THOMAS, J.). "The question itself is the stigma-because either racial discrimination did play a role, in which case the person may be deemed 'otherwise unqualified,' or it did not, in which case asking the question itself unfairly marks those ... who would succeed without discrimination."
 

 Ibid.
 

 Although cloaked in good intentions, the University's racial tinkering harms the very people it claims to be helping.
 

 * * *
 

 For the foregoing reasons, I would overrule
 
 Grutter
 
 . However, because the Court correctly concludes that the Court of Appeals did not apply strict scrutiny, I join its opinion.
 

 The standard of "pressing public necessity" is more frequently called a "compelling governmental interest." I use the terms interchangeably.
 

 Similar arguments were advanced unsuccessfully in other cases as well. See,
 
 e.g.,
 
 Brief for Respondents in
 
 Sweatt v. Painter,
 
 O.T. 1949, No. 44, pp. 94-95 (hereinafter Brief for Respondents in
 
 Sweatt
 
 ) ("[I]f the power to separate the students were terminated, ... it would be as a bonanza to the private white schools of the State, and it would mean the migration out of the schools and the turning away from the public schools of the influence and support of a large number of children and of the parents of those children ... who are the largest contributors to the cause of public education, and whose financial support is necessary for the continued progress of public education.... Should the State be required to mix the public schools, there is no question but that a very large group of students would transfer, or be moved by their parents, to private schools with a resultant deterioration of the public schools" (internal quotation marks omitted)); Brief for Appellees in
 
 Briggs v. Elliott,
 
 O.T. 1952, No. 101, p. 27 (hereinafter Brief for Appellees in
 
 Briggs
 
 ) ("[I]t would be impossible to have sufficient acceptance of the idea of mixed groups attending the same schools to have public education on that basis at all.... [I]t would eliminate the public schools in most, if not all, of the communities in the State").
 

 While the arguments advanced by the University in defense of discrimination are the same as those advanced by the segregationists, one obvious difference is that the segregationists argued that it was
 
 segregation
 
 that was necessary to obtain the alleged benefits, whereas the University argues that
 
 diversity
 
 is the key. Today, the segregationists' arguments would never be given serious consideration. But see M. Plocienniczak, Pennsylvania School Experiments with 'Segregation,' CNN (Jan. 27, 2011), http://www.cnn.com/2011/US/01/27/pennsylvania. segregation/index.html?_s=PM:US (as visited June 21, 2013, and available in Clerk of Court's case file). We should be equally hostile to the University's repackaged version of the same arguments in support of its favored form of racial discrimination.
 

 The lowest possible score on the SAT is 600, and the highest possible score is 2400.
 

 The success of historically black colleges at producing graduates who go on to earn graduate degrees in science and engineering is well documented. See,
 
 e.g.,
 
 National Science Foundation, J. Burrelli & A. Rapoport, InfoBrief, Role of HBCUs as Baccalaureate-Origin Institutions of Black S & E Doctorate Recipients 6 (2008) (Table 2) (showing that, from 1997-2006, Howard University had more black students who went on to earn science and engineering doctorates than any other undergraduate institution, and that 7 other historically black colleges ranked in the top 10); American Association of Medical Colleges, Diversity in Medical Education: Facts & Figures 86 (2012) (Table 19) (showing that, in 2011, Xavier University had more black students who went on to earn medical degrees than any other undergraduate institution and that Howard University was second).